Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| M.A., individually and on behalf of Z.A. a minor,<br><br>          Plaintiffs,<br><br>vs.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and the KAISER ALUMINUM FABRICATED PRODUCTS WELFARE BENEFIT PLAN.<br><br>          Defendants. | COMPLAINT<br><br>Case No. 1:21-cv-00083 - JNP |

Plaintiff M.A. individually and on behalf of Z.A. a minor, through his undersigned

counsel, complains and alleges against Defendants United Healthcare Insurance Company,

United Behavioral Health (collectively "United") and the Kaiser Aluminum Fabricated Welfare

Benefit Plan ("the Plan") as follows:

//

//

## PARTIES, JURISDICTION AND VENUE

1. M.A. and Z.A. are natural persons residing in Spokane County, Washington. M.A. is Z.A.'s father.

2. United is an insurance company headquartered in Hennepin County, Minnesota and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). M.A. was a participant in the Plan and Z.A. was a beneficiary of the Plan at all relevant times. M.A. and Z.A. continue to be participants and beneficiaries of the Plan.

4. Z.A. received medical care and treatment at BlueFire Wilderness Therapy ("BlueFire") from June 4, 2018, to August 8, 2018, and Uinta Academy ("Uinta") from August 9, 2018, to August 27, 2019. These are licensed treatment facilities which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. BlueFire is located in Idaho and Uinta is located in Cache County, Utah.

5. United denied claims for payment of Z.A.'s medical expenses in connection with her treatment at BlueFire and Uinta.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because United does business in Utah, and the treatment at issue largely took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the

case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Z.A.'s Developmental History and Medical Background

9. From a young age Z.A. struggled with depression and feelings of isolation. When she was in the seventh grade, Z.A. confessed that she had been self-harming on a weekly basis, and she started regularly attending therapy.

10. Around August of 2017, Z.A. started exhibiting severe behavioral outbursts as well. These included yelling, screaming, jumping on a car and kicking the windows, locking herself in a room, pushing her grandmother, and attempting to self-harm with a knife. Z.A. was taken to the emergency room following the attempted self-harm incident.

11. Z.A. stopped taking care of her hygiene and began eating excessively. Her school performance suffered, she became increasingly defiant towards school officials, and she was suspended on several occasions.

12. Z.A. started abusing drugs and brought a water bottle laced with codeine to school. She became unable to calm herself and again threatened to self-harm. Z.A. also started

abusing alcohol and marijuana and was caught vaping. Following another incident of self-harm at school, Z.A. was again taken to the emergency room.

13. Not long afterwards, Z.A. was admitted to the emergency room once more following a sudden onset of vomiting and tachycardia. Initially this was suspected to be nothing more than a physical illness but Z.A. later confessed that it was brought on after she had attempted to commit suicide via overdose.

14. Z.A. became sexually active around the age of thirteen. Z.A. continued to see a wide variety of mental health professionals but none of the treatment seemed to be effective. Z.A. continued to behave irrationally and following a lengthy school suspension, she was admitted to BlueFire.

**BlueFire**

15. Z.A. was admitted to BlueFire on June 4, 2018.

16. In a series of Explanation of Benefits ("EOB") statements United denied payment for Z.A.'s treatment under code B6: "Additional information we requested from the provider was not received within the required timeframe. Charges in the provider responsibility field were denied."

17. On January 10, 2019, M.A. submitted a level one appeal of the denial of Z.A.'s treatment. M.A. wrote that after receiving the denial EOB's he contacted United to see what information it required[1] and was told to submit a copy of Z.A.'s medical records. M.A. stated that he faxed this information on October 3, 2018.

18. After United failed to respond to M.A.'s record submission, he reached out on November 16, 2018, to follow up. The United representative told him the claims could take 30 days

---

[1] M.A.'s contact was done through a representative.

to process but did confirm that the medical records had been received. M.A. sent United another copy of Z.A.'s medical records for good measure.

19. M.A. wrote in the appeal that he had complied with his responsibilities concerning the medical records and they had been both submitted and received in a timely manner, well within the timelines outlined by his insurance policy. He wrote that United however had failed to abide by its responsibilities and that it was well outside of the 30 day limit it had to respond to his submissions. He also stated that he had received conflicting information from United and had been told both that his claims were still being processed and also that they had been denied. He asked United to explain this discrepancy.

20. In a letter dated February 14, 2019, United again denied payment for Z.A.'s treatment. The letter gave the following justification for the denial:

> Based on the Optum Behavioral Clinical Policy for Wilderness Therapy, it is my determination that no authorization can be provided for DOS 06/16/2018 through 08/08/2018. Your daughter attended Blue Fire Wilderness Therapy, a Wilderness Therapy program. According to the Optum Behavioral Clinical Policy on Wilderness Therapy, such treatment is considered unproven and not medically necessary. As such, treatment in a Wilderness Therapy program is not a covered benefit. In addition, Blue Fire Wilderness Therapy did not appear to provide the scope or intensity of services that would meet the definition of a clinical residential treatment center. Evidence based treatment known to help your child's condition was available in the community.

21. On April 2, 2019, M.A. submitted a level two appeal of the denial of Z.A.'s treatment at BlueFire. M.A. stated that Z.A.'s treatment was clinically appropriate and that there was no exclusion in his insurance policy for the outdoor behavioral health treatment Z.A. received. M.A. contended that BlueFire was licensed by the State of Idaho which he claimed, clearly showed its legitimacy as an intermediate level mental healthcare provider.

22. M.A. wrote that Outdoor Behavioral Health programs were a widely recognized treatment option and just like residential treatment centers and other covered services, they had their own universally recognized billable revenue code. He also pointed out that BlueFire met the Plan's definition of an alternate facility as well as its definition of medical necessity.

23. M.A. reminded United of its responsibilities under ERISA, including its obligations to take into account all of the information he provided, to use appropriately qualified reviewers and to disclose their identities, to provide a clear and specific justification for the denial, to act in his best interest, and to provide him with a full, fair, and thorough review.

24. M.A. argued that United had not performed an adequately comprehensive review of Z.A.'s treatment and, among other things, listed the incorrect dates of service despite the fact that he had clearly listed the correct dates of service in his level one appeal.

25. M.A. contended that United's exclusion of outdoor behavioral health treatment was a violation of MHPAEA. He stated that BlueFire was an intermediate level behavioral health facility and that MHPAEA required United to administer benefits for these services in a manner that was no more restrictive than the manner in which it administered intermediate level medical or surgical benefits.

26. M.A. identified skilled nursing and inpatient rehabilitation as some of the medical or surgical analogues to Z.A.'s treatment. M.A. argued that United was not excluding payment due to the content or quality of the services that Z.A. received. For instance, it did not take issue with Z.A.'s treatment plan or argue that the highly trained staff of psychologists and therapists were unqualified, but instead denied payment solely based

on facility type and physical setting. M.A.'s contended that because United did not similarly restrict intermediate level medical or surgical care it was in violation of MHPAEA.

27. M.A. attached United's guidelines for skilled nursing and cognitive rehabilitation facilities and stated that he was unable to find any restrictions based on facility type or treatment setting for either of these services. He asked if he were incorrect in his assessment regarding United's disparate treatment of medical and mental health facilities that it identify where and how he was mistaken using specific examples.

28. M.A. quoted the Plan's definition of experimental and investigational care and contended that although BlueFire did not meet any of these definitions United still partially denied payment on those grounds. M.A. argued that United intentionally restricted the availability of behavioral health treatment using criteria it had invented itself for that purpose. He pointed out that in the case of medical or surgical treatment United deferred to regulatory authorities like the FDA to determine whether a service was experimental, but it appeared to evaluate outdoor behavioral health treatment without consulting any outside authorities and instead relied on proprietary internal criteria. M.A. contended that this was a clear breach of MHPAEA.

29. M.A. stated that the effectiveness of wilderness treatment was backed up by peer reviewed literature. He included academic research articles to this effect and included the contact information of an expert in the field, Dr. Michael Gass from the University of New Hampshire and encouraged United to contact him with any questions. M.A. accused United of cherry-picking data which supported its decision to deny care rather than

acknowledge the evidence which "overwhelmingly leans towards a positive outlook on the value of these programs."

30. M.A. requested that in the event United upheld the denial that it provide him with the specific reasoning for the denial along with any corresponding evidence, any administrative service agreements that existed, the Plan's clinical guidelines and medical necessity criteria used to evaluate the claim, including the Plan's skilled nursing, inpatient rehabilitation, and hospice criteria, along with any reports from any physician or other professional regarding the claim. (collectively the "Plan Documents")

31. M.A. stated that he was entitled to these materials as they constituted documents under which the Plan was operated and were necessary for him to perform a further parity analysis of the Plan.

32. In a letter dated May 3, 2019,[2] United upheld the denial of payment for Z.A.'s treatment. The reviewer wrote in part:

> The criteria were not met because:
> - Your child did not need the care provided in an Outdoor Behavioral Health setting, which is most closely aligned with and billed at the Mental Health Residential Treatment Center level of care.
> - Your child did not need the care provided in a Residential Treatment Center program.
> - Your child was enrolled in a residential Wilderness Therapy Program, which is not a covered benefit.
> - Your child could have been safely treated in a less intensive Level of Care.
>
> In your case:
> - Your child was not taking any scheduled medications.
> - Your child was able to participate in her treatment plan.
> - Your child was not acting on every impulse.
> - Your child safely engaged in organized outdoor activities and camping trips.

---

[2] United actually sent the Plaintiffs multiple letters dated May 3, 2019. Each letter was signed by Howard Wong, MD and offered the same justification for denying payment. However, each letter addressed different dates of service.

- Your child was not reported to be dangerous to herself or others.
- Your child was able to look after her day to day needs.
- Your child did not have clinical issues requiring 24/7 monitoring.
- Your child had a safe place to live and the support of family.

The request cannot be approved at this time by your health plan. Instead your child could have continued care in the Mental Health Partial Hospital Program (PHP) setting, with family and community supports. PHP provides continued structure with frequent provider. [sic] Partial Hospitalization lets patients practice coping skills outside of program hours. Children and adolescents usually live at home during PHP. Please talk to your provider about your child's care.

33. On June 26, 2019, M.A. submitted a second level two member appeal. M.A. stated that despite his requests that United review the complete dates of Z.A.'s treatment, it had arbitrarily chosen to exclude certain dates of service. M.A. wrote that this forced him to draft a second level two appeal to address these dates of service that United had not considered.

34. M.A. referenced the arguments he had raised in his initial level two appeal and then argued that it was disingenuous for United to claim that "Your child did not need the care provided in a Residential Treatment Center program" when it then authorized the initial residential treatment portion of Z.A.'s treatment at Uinta which immediately followed her discharge from BlueFire.

35. M.A. also protested United's use of criteria such as, "Your child was not reported to be dangerous to herself or others" and contended that this use of acute level requirements to evaluate a subacute level of care constituted a violation of MHPAEA. M.A. directed United to perform a parity analysis to assess the Plan's MHPAEA compliance and asked to be provided with a copy of this analysis as well as any accompanying documentation. He stated that he was entitled to this information under MHPAEA. M.A. again requested a copy of the Plan Documents.

36. In a letter dated July 24, 2019, United upheld the denial of payment for Z.A.'s treatment.

The reviewer wrote in part:

> Your child was admitted for treatment of mood problems. After reviewing the medical records, it is noted that your child's condition did not meet Guidelines for coverage of treatment in this setting. Your child was stable from a medical and mental health standpoint, as she was able to participate in activities in the field. She was not taking any medication. She was able to take care of her needs. She had family support. She did not require 24-hour care. In addition, treatment at this facility was not at the level of intensity expected at this level of care.
> The facility is a wilderness therapy program. There is not enough evidence that wilderness therapy is safe and effective for treating mental health conditions. Your child could have continued care in the Mental Health Partial Hospitalization Program setting.

37. On August 19, 2019, M.A. requested that the denial of payment be evaluated by an external review agency. M.A. again reiterated that the Plan contained no exclusion for wilderness services, that even if United alleged that BlueFire did not meet the standards for residential treatment it still satisfied the Plan's requirements for an "alternate facility", and coverage was mandated under MHPAEA.

38. M.A. again pointed out the disconnect in claiming that Z.A. did not need residential treatment services at BlueFire while then approving the initial stages of Z.A.'s treatment at Uinta shortly afterwards. M.A. also stated that United was currently a defendant in a class action lawsuit regarding its alleged mishandling of wilderness claims.

39. In a letter dated October 17, 2019, the external review agency upheld the denial of payment for Z.A.'s treatment. The unidentified reviewer wrote in part:

> The clinical information reviewed indicates that the patient had no significant ongoing symptoms that required residential treatment level of care between 06/04/2018 to 06/15/2018 and 06/16/2018 to 08/08/2018. The patient was not reported to have any suicidal or homicidal ideations or deemed to be at risk of harm to self or others. She was not reported to have any symptoms suggestive of psychosis including hallucinations, delusions, or paranoia. She was not reported to have any significant symptoms of mania or hypomania. She was not reported to have exhibited any significant and persistent agitation or aggressive behaviors.

The patient was not reported to have engaged in any self-injurious behaviors recently and was not reported to have any significant urge. She was not reported to have significant functional impairments including activities of daily living or self-care. The patient was not reported to have any significant adverse effects from psychotropic medications. She had no significant ongoing medical problems that could potentially interfere with her recovery. There was no indication of the patient had [sic] significant barriers to change or an unsafe recovery environment. She was noted to have a supportive family who were involved in her care. The patient was noted to have been discharged to another residential treatment level of care on 08/09/2018. …

Treatment at a residential level of care with a 24-hour structured setting is required when there are significant safety concerns that require daily monitoring, significant functional impairments related to behavioral symptoms including impairments in self-care and activities of daily living, or significant substance use affecting daily functioning (1-9). Such symptoms include persistent low mood, agitation, aggression (1, 4, 7), persistent active suicidal ideations, symptoms of psychosis or mania, and continued substance use affecting physical and emotional health.

The clinical information reviewed indicates that the patient had no significant ongoing symptoms that required residential treatment level of care between 06/04/2018 to 06/15/2018 and 06/16/2018 to 08/08/2018. She was not reported to have symptoms that would require 24 hour supervision and observation. The patient was not reported to have expressed any suicidal or homicidal ideations or deemed to be at significant risk of harm to self or others during her stay at the residential treatment level of care. She was not reported to have any symptoms suggestive of psychosis including hallucinations, delusions or paranoia. She was not reported to have any symptoms of mania or hypomania. She was not reported to have exhibited any significant agitation or aggression. The patient had no significant ongoing medical problems that required monitoring. She was not reported to have significant functional impairments and was able to care for herself. The patient was not reported to have any significant adverse effects from her medications. The clinical information reviewed indicates that the patient may have been managed safely in a less restrictive setting and lower level of care such as a partial hospitalization program.

**Uinta**

40. Z.A. was admitted to Uinta on August 9, 2018.

41. In a letter dated August 21, 2018, United denied payment for Z.A.'s treatment at "Unity Academy RTC." The United reviewer wrote in part:

11

It is my opinion that the requested service does not meet the level of care guideline required to be followed in your child's behavioral health plan benefits.

After looking at your child's information it looks like your child was stable. Your child was not having any medical problems. Your child's mood was stable and your child's behavior was stable. Your child was said to be getting along with others, following directions, and there had been no recent dangerous behaviors. It looks like your child could have continued to improve with more treatment in a less intense level of care.

42. On December 28, 2018, M.A. submitted a level one appeal of the denial of payment for

   Z.A.'s treatment. M.A. asked United to comply with its obligations under ERISA and that

   it provide him with a full, fair, and thorough review and act in his best interest as it was

   required to do.

43. M.A. stated that Z.A.'s treatment was offered in accordance with the opinions of her

   treatment team and included letters of medical necessity to that effect. In a letter dated

   November 4, 2018, licensed clinical psychologist Alison LaFollette wrote in part:

   Prior to coming to Uinta Academy, [Z.A.]'s family had her in individual therapy and on medication for over a year without success. Due to her escalating anger and suicidality, they enrolled in a wilderness therapy program from June until August 2018.

   Given the long-standing nature of [Z.A.]'s problems and the variety of modalities she has engaged in without prolonged success, it is strongly recommended [that] she continue in a residential therapy program which will address her emotional and educational needs. She is currently in need of 24/7 supervision and continual monitoring and feedback. Without 24/7 supervision [Z.A.] will be unable to fully access and benefit from her education.

   In an undated letter Shannon Kerrick, LCSW wrote in part:

   [Z.A.] was admitted to our wilderness therapy program on 6/4/18 and discharged on 8/9/18. During this time our clinical team assessed and treated Ms. [Z.A.] for Major Depressive Disorder, Generalized Anxiety Disorder as well as parent-child relational problems. During her stay Ms. [Z.A.] received individual, group, family and equine therapy.

   Prior to admittance to Bluefire, Ms. [Z.A.] had multiple self-harm episodes, 2 prior suicide attempts, multiple emergency department visits due to behavioral

problems and academic issues. During her stay with us, progress was slow as she struggled to be able to regulate and express her emotions effectively, especially when communicating with her family. Although the client was able to better handle her stressors in a controlled environment the treatment team had concerns with the client being able to manage this if she returned home.

Due to the slow and limited progress, as well as continued behavioral issues along with the client's past life-threatening and impulsive behaviors it was recommended by the treatment team that the client continue treatment in a residential treatment setting with continued individual, group and family therapy. It is expected that with continued treatment that Ms. [Z.A.] will be able to return home and be able to return to function at a greater capacity.

Tracey Leyde, Z.A.'s assistant principal wrote in part in a letter dated November 7, 2018:

Z was **THE**[3] student I was most concerned about going to a large High School. We held transition meetings and sent up info to the HS counselor and intervention teacher. Having been an administrator at that high school just 2 years before I was terrified Z (who is a brilliant, funny, creative, interesting, fierce, protective young woman) would get lost – I knew she would just walk out the door each day and end up on the streets of down town [sic] Spokane. In my 18 years as an educator I have seen a lot of students needing intensive mental health support and Z ranks right there at the top of the list as one of the most severe.

44. M.A. stated that while United had made vague references to its reliance on Optum Level of Care Guidelines, it had not specified which of these guidelines it had used. M.A. pointed out that the Optum Guidelines had changed significantly shortly before Z.A. started treatment. He pointed out that in the 2018 guidelines he was able to obtain there had been significant changes concerning non-quantitative treatment limitations.

45. M.A. expressed concern that United had used outdated guidelines which were not compliant with MHPAEA, as it was applying medical necessity requirements to Z.A.'s mental healthcare which it did not apply to analogous medical or surgical care. M.A. argued that United was clearly concerned enough that its criteria violated MHPAEA that it had made significant alterations to its residential treatment criteria in May of 2018, and

---

[3] Emphasis in original.

excised requirements such as an "imminent or current risk of harm to self, others, and/or property" or "Acute impairment of behavior or cognition…"

46. M.A. voiced his concern that United appeared to have evaluated the medical necessity of Z.A.'s treatment using criteria which were no longer in effect.

47. M.A. included an undated letter from Michael Connolly, MD which stated that individuals suffering from acute level symptoms such as psychosis or posing an active threat to themselves or others, "cannot be cared for in a residential treatment setting without violating well-recognized standards for proper care of substance use disorders and mental health issues." M.A. again asked to be provided with a copy of the Plan Documents.

48. In a letter dated February 2, 2019, United partially overturned the denial of payment for Z.A.'s treatment at "Unity Academy RTC" from August 9, 2018 through January 3, 2019 and authorized treatment until September 22, 2018. the letter stated in part:

> After reviewing the available information, it is noted your child had made progress and that her condition no longer met Guidelines for further coverage of treatment in this setting. Your child was cooperative, responsive to staff, and medication adherent. She participated fully in her care. She interacted appropriately with staff and peers. She was usually open and receptive to feedback and coaching. She presented no significant, acute behavioral management challenges. Your child posed no risk of harm to herself or others. She had no self harm behaviors. She was keeping herself safe. She was not aggressive or destructive. Her thinking made sense. Her mood was stable and positive overall; no serious disturbance was present. She continued to develop and utilize coping skills. There was no report of problems with eating or sleeping. Self care was adequate. There were no concerning medical issues. Medication appeared helpful. You were supportive and involved. She no longer appeared to need the treatment intensity of a 24 hour monitored setting. It appears that care could have continued in a less restrictive setting. Given progress, your child could have continued care in the Mental Health Intensive Outpatient Program or Outpatient setting.

49. In a letter dated February 8, 2019, United denied payment at "Unity Academy RTC"

from January 4, 2019, forward. The reviewer gave the following justification for the

denial:

> After reviewing all of the materials presented (473 pages) for the urgent appeal,
> there is no documentation to support your daughter's ongoing need for residential
> treatment. The most recent clinical note was a group note dated 12/13/2018. There
> was no report of ongoing defiance, self-injurious behaviors or aggression. It
> appears that your child was fully participating in groups and activities and was
> learning coping skills. Your daughter is even reported to take her own time-outs
> when she experienced anger, anxiety, or depressive symptoms without prompting
> from staff. It appears that your daughter could have continued her recovery at the
> intensive outpatient level of care.

50. On April 2, 2019, M.A. submitted a level two appeal of the denial of Z.A.'s treatment at

Uinta. M.A. wrote that United continued to disregard his requests concerning ERISA. He

stated that United had not provided him with the materials he had requested and appeared

to have disregarded all of the evidence he had provided except for the medical records,

and had additionally utilized a reviewer specialized in adult and geriatric psychiatry to

evaluate his adolescent daughter's care.

51. M.A. stated that despite his observation that United had amended its criteria to remove

references to acute level requirements for residential treatment, United's reviewers

continued to rely on outdated acute level requirements such as a danger to self or others

as some of the principal justifications for denying care, despite the fact that MHPAEA

explicitly prohibited this and United's criteria in effect at the time Z.A. received

treatment had removed these requirements. M.A. once more asked United to perform a

parity analysis of the Plan to ensure MHPAEA compliance.

52. M.A. reiterated that United did not require its insureds receiving intermediate level

medical or surgical care to exhibit acute symptoms, but it quite clearly required this of

Z.A.'s mental health treatment. M.A. wrote that not only was this a nonquantitative

treatment limitation, but it also contradicted generally accepted standards of medical

practice.

53. M.A. included another letter of medical necessity with the appeal from Melissa

Adamson, MSW, LCSW, dated December 15, 2018, which stated in part:

> While [Z.A.] has made some clinical progress since admission, she continues to need a highly structured and clinically intensive environment. …
>
> [Z.A.'s] aggression can be contained in our environment but in a traditional school setting, she puts others at risk for physical injury and herself at risk for retaliatory aggression from others and involvement with the state legal system. Without a highly structured and closely monitored daily living environment, [Z.A.] will continue to struggle academically and socially, and escalate into dangerous and potentially life threatening behaviors. …
>
> Even with this high level of therapeutic support, [Z.A.] struggles to engage academically and has made slow progress. Our treatment team strongly believes that without continued therapeutic support, [Z.A.] will lose the little academic progress she has made and will not be able to reach her full academic potential.
>
> It is strongly recommended that [Z.A.] continue and complete treatment at Uinta Academy and learn how to have relationships enabling her to function in society, how to keep herself safe, how to be successful in school, and learn to set appropriate boundaries and establish a sense of self.

54. M.A. also included an updated copy of Z.A.'s medical records with the appeal. These

records showed Z.A.'s continued struggles with aggression, bullying, hygiene, instances

of property destruction, and threatening behaviors. Z.A. was also restrained on multiple

occasions and was placed on suicide watch. M.A. again requested to be provided with a

copy of the Plan Documents.

55. In a letter dated April 10, 2019, United affirmed its coverage authorization for Z.A.'s

treatment from August 9, 2018, to September 21, 2018.

56. In a letter dated May 2, 2019, United again upheld the denial of payment for "Unity

Academy." The letter stated in part:

> Your child was admitted for treatment of problems with her mood and behavior.
> After reviewing the medical records, it is noted your child had made progress and
> that your child's condition no longer met Guidelines for further coverage of
> treatment in this setting. She was doing better. She was stable from a medical and
> mental health standpoint. She was motivated and participating in treatment. She
> had family support. She was able to take care of her needs. She had behavior
> problems that could have been addressed at a lower level of care. She did not
> require 24-hour care. Your child could have continued care in the Mental Health
> Outpatient setting.

57. Additionally, in a notice with a processing date of July 23, 2019, United denied payment

for "Unity Academy RTC" under code S8

> Your plan provides benefits for services that are determined to be covered health
> services. The information received does not support measurable progress toward
> defined goals for these services. Therefore, additional benefit are not available.

58. On August 19, 2019, M.A. requested that the denial of payment for Z.A.'s treatment be

evaluated by an external review agency. M.A. contended that United had not reviewed all

of the evidence he submitted, nor had it complied with its ERISA obligations despite his

repeated requests and its requirements to do so.

59. In a decision dated September 19, 2019, the external review agency upheld the denial of

payment for Z.A.'s treatment. As with all the other denials, the letter again mistakenly

referred to Uinta as Unity Academy RTC. The unidentified reviewer wrote in part:

> At the time of her admission into the RTC level of care information provided
> indicates that she was cooperative, pleasant, she was not suicidal or homicidal.
> She was not psychotic, she does have a history of cutting but she last cut herself at
> the end of May, currently she does have some thoughts of wanting to cut herself
> but she does not have any type of plan or intent to cut. She is alert and fully
> oriented and she claims that her sleep and appetite are both normal. She continues
> to be mildly depressed and she continues to be mildly anxious. She has no
> hallucinations. Her vital signs are stable. It is also noted that she can be irritable
> and reactive, she can be labile but she is re-directable. …

Given the information provided, this request is not recommended for approval because she had no objectively noted mental health problems of any type that would have needed, for any reasons, the continuation of 24 hour care, supervision, observation, management or containment.

This request is not considered to be medically necessary as medical necessity means healthcare services provided for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, mental illness, substance use disorder, condition, disease or its symptoms, that are all of the following: in accordance with generally accepted standards of medical practice, and, clinically appropriate, in terms of type, frequency, extent, sight [sic] and duration, and considered effective for the patient's illness, injury, mental illness, substance use disorder, disease or its symptoms, and, not mainly for the patient's convenience or that of the patient's doctor or other healthcare provider, and, not more costly than an alternative drug, service, or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's illness, injury, disease or symptoms.

60. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

61. The denial of benefits for Z.A.'s treatment was a breach of contract and caused M.A. to incur medical expenses that should have been paid by the Plan in an amount totaling over $230,000.

62. United failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of M.A.'s repeated requests.

## **FIRST CAUSE OF ACTION**

### **(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

63. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as United, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29

U.S.C. §1104(a)(1).

64. United and the Plan failed to provide coverage for Z.A.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

65. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

66. The denial letters produced by United do little to elucidate whether United conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. United failed to substantively respond to the issues presented in M.A.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

67. United and the agents of the Plan breached their fiduciary duties to Z.A. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Z.A.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of Z.A.'s claims.

68. The actions of United and the Plan in failing to provide coverage for Z.A.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

//

//

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

69. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of United's fiduciary duties.

70. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

71. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

72. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

73. One of the ways that M.A. alleged United violated MHPAEA was a restriction placed on outdoor behavioral health treatment based primarily on restrictions on facility type and geographic location. M.A. stated that United's denial for Z.A.'s wilderness treatment was

not based on the content or quality of treatment but appeared to have been denied solely due to the treatment taking place outdoors.

74. M.A. alleged that United similarly restricted the availability of care by relying on its own guidelines to classify a mental health service as experimental or investigational, but in the case of medical or surgical care it instead relied on the expert opinions of regulatory agencies to determine whether services qualified as investigational.

75. The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

76. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Z.A.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

77. For none of these types of treatment does United exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

78. When United and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

79. United and the Plan evaluated Z.A.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process

resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

80. As another example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that Z.A. received. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in United's denial letters such as "The patient was not reported to have expressed any suicidal or homicidal ideations or deemed to be at significant risk of harm to self or others during her stay at the residential treatment level of care. She was not reported to have any symptoms suggestive of psychosis including hallucinations, delusions or paranoia."

81. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that Z.A. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

82. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

83. M.A. argued that although United's criteria used to explicitly include acute care requirements for residential treatment care, United was concerned enough that these

requirements violated MHPAEA and in 2018 it made significant changes to its criteria and, on paper at least, excised these requirements.

84. M.A. pointed out that although it had removed the acute care prerequisites for residential treatment, United continued to evaluate Z.A.'s treatment under an acute standard. M.A. wrote that not only was this a misapplication of United's criteria, but it also constituted a non-quantitative treatment limitation as United did not limit medical or surgical care in this manner.

85. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and United, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

86. M.A. repeatedly directed United to perform a MHPAEA analysis of the Plan. He expressed serious concern that United was violating the statute and asked that United respond to his concerns using specific and direct examples. Not only did United not do this, but in spite of the multitude of denial letters it issued it does not appear to have so much as addressed MHPAEA in any of them. United additionally failed or refused to produce a copy of the Plan Documents in spite of M.A.'s repeated requests.

87. The violations of MHPAEA by United and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

23

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

88. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for Z.A.'s medically necessary treatment at BlueFire and Uinta under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs'

Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 4th day of June, 2021.

By ___ s/ Brian S. King _____
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Spokane County, Washington.