Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Tera J. Peterson, #12204
BRIAN S. KING PC
420 E. South Temple, Suite 420
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
tera@briansking.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| M.A. and Z.A.,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, and KAISER ALUMINUM FABRICATED PRODUCTS WELFARE BENEFIT PLAN<br><br>    Defendants. | **MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 1:21-cv-00083-JNP<br><br>Judge Jill N. Parrish |

Plaintiffs M.A. and Z.A. hereby move the Court to award them summary judgment

against Defendants United Healthcare Insurance Company ("United"), United Behavioral Health

("UBH"), and Kaiser Aluminum Fabricated Products Welfare Benefit Plan (the "Plan")

(collectively, "Defendants") for Plaintiffs' claim for recovery of benefits under the Employee

Retirement Income Security Act ("ERISA"); and for Plaintiffs' claim that Defendants violated

the Mental Health Parity and Addiction Equity Act ("MHPAEA").

## **INTRODUCTION**

After numerous incidents of self-harm, suicide attempts, suspension from school, and escalating aggressive and defiant behavior, Z.A.'s outpatient providers strongly recommended that she receive treatment at a residential treatment program. Z.A.'s parents consequently admitted her to an outdoor behavioral health treatment program called BlueFire Wilderness Therapy ("BlueFire") followed by residential treatment at Uinta Academy ("Uinta"). Defendants denied payment for Z.A.'s treatment at BlueFire and Uinta except for her first forty-four days at Uinta.

Defendants wrongly denied payment of Z.A.'s therapeutic treatment at BlueFire by applying an internal policy that categorically excludes "wilderness therapy" as not medically necessary for mental health treatment. But "wilderness therapy" is not defined nor is it a term of the Plan, and Defendants failed to provide the Plaintiffs with any evidence or reasoning to either explain or justify their denial.

In contrast, Plaintiffs submitted appeals that documented Z.A.'s mental health conditions, the treatment that she received, and explained how Z.A. satisfied the Plan definitions. Their appeal letters attached Z.A.'s medical records confirming that Z.A. received therapeutic care at BlueFire as well as copious scholarly articles that demonstrate the outdoor therapy is effective and generally accepted.

In response, Defendants made no meaningful attempt to evaluate the information Plaintiffs submitted or respond to Plaintiffs' assertions. Instead, Defendants provided essentially the same conclusory denials and simply restated its conclusion that wilderness treatment was excluded.

Defendants likewise wrongly denied payment of Z.A.'s residential treatment at Uinta. Plaintiffs submitted appeals that documented how Z.A.'s care met the Plan's definition of medical necessity. The appeal letters attached Z.A.'s medical records and numerous letters of medical necessity from her treating professionals who all strongly recommended that she continue to receive residential treatment. Again, Defendants made no meaningful attempt to evaluate this information or respond to Z.A.'s treating professionals' opinions.

As the facts in the prelitigation demonstrate, Z.A.'s treatment at BlueFire and Uinta was medically necessary and Defendants' decision to deny Z.A.'s claims was inconsistent with the terms of the Plan. The Court should consequently award summary judgment to Plaintiffs on their first cause of action.

Further, the Court should also find that Defendants violated the Mental Health Parity and Addiction Equity Act ("MHPAEA") because it categorically excluded wilderness therapy for mental health treatment, and its denial letters reflect that it required more acute symptomology for Z.A.'s mental health disorders in order to cover her residential treatment than it would have required for patients seeking an analogous level of care for medical or surgical conditions. Accordingly, the Court should award summary judgment to Plaintiffs on their second cause of action as well.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1. M.A. is a participant in, and Z.A. is a beneficiary of, a self-funded employee welfare benefits plan ("the Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA"). M.A. is Z.A.'s father.[2]

2. United acted as a third-party claims administrator for the Plan.[3]

### Z.A.'s Developmental History and Medical Background

3. Z.A. began feeling sad and alone in the sixth grade.[4] By the seventh grade, she was self-harming.[5]

4. Around the same time, a family friend informed Z.A.'s parents that Z.A. was making suicidal statements on social media.[6]

5. Z.A.'s parents also found Z.A.'s diary which described her suicidal thoughts, her plans for death, and her plans for her funeral.[7]

6. Z.A. also began having behavior outbursts and "out of control behaviors."[8]

7. The first incident happened while they were on vacation. Z.A. began yelling, screaming, and jumping on her brother's car. Z.A. then entered the car, locked herself inside, and

---

[1] In this ERISA-governed case the Defendants previously provided a copy of the prelitigation appeal record ("the Record") to the Plaintiffs. This record has been filed under seal with the Court and contains pages that have been Bates stamped as United-Kaiser_000001 through United-Kaiser 009186. Plaintiffs cite the Record as R.1 through R.9185. Additionally, Defendants produced documents in discovery that are likewise filed under seal and are Bates Stamped as United-Kaiser_009173 through United-Kaiser_012225. Plaintiffs cite these additional materials as United-Kaiser_9173 through United-Kaiser_12225.
[2] *See* Complaint, ¶¶ 1, 3 (ECF Doc. No. 2); *see also* Answer, ¶¶ 1, 3 (ECF Doc. No. 13).
[3] *See* Complaint, ¶ 2; Answer, ¶ 2.
[4] *See* R.178.
[5] *See* R.178, 400, 560.
[6] *See id*.
[7] *See* R.183.
[8] R.400, *see also* R.179.

4

kicked at the car windows. Z.A. eventually went inside their vacation cabin, pushed her grandmother, and tried to grab a knife to harm herself. Z.A.'s brother stopped her. [9]

8. Z.A.'s parents took her to the hospital, but they sent Z.A. home because she was not deemed to be a suicide risk.[10]

9. In the eighth grade, Z.A.'s mental health took another "sharp decline."[11]

10. She became sexually active and "promiscuous."[12]

11. She was "physically aggressive towards her mom."[13]

12. Her personal hygiene deteriorated. She refused to wash her hair and kept it in a bun, refusing to take it out. After four months, she had developed dreadlocks that had to be cut off.[14]

13. Z.A. also would not change her clothes, including her underwear. She slept in and went to school in the same clothes.[15]

14. Z.A. also began eating excessively and gained 50 pounds in one year.[16]

15. At school, A.Z. was rude and disrespectful to teachers,[17] yelling at them,[18] telling them they were "stupid,"[19] and refusing to follow their directions.[20]

---

[9] *See id.*
[10] *See Id.*
[11] R.183; *see also* R.256.
[12] R.400, *see also* R.180, 319, 552.
[13] R.400, *see also* R.319, 552.
[14] *See* R.179.
[15] *See id.*
[16] *See id.*
[17] *See id.*
[18] *See* R.215.
[19] R.201.
[20] *See* R.210, 212.

16. She also threatened other students, hid from teachers and staff, left school without permission, disrupted other classes, and threatened suicide when confronted with her behavior.[21]

17. Z.A. consequently was suspended from school "regularly" for truancy, "anger, hostility, and aggression."[22]

18. Z.A. was also using marijuana, drinking alcohol, and vaping.[23]

19. For a few weeks, she filled her water bottle with codeine cough syrup and water and drank it throughout the school day.[24]

20. When Z.A.'s parents discovered the codeine, Z.A. "lashed out" and was unable to calm down.[25] Her father had to take her to the emergency room. There, a drug test confirmed that she had drugs in her system.[26]

21. That spring, Z.A. went to the emergency room for the third time for self-harm. She cut her wrists on the school bus on the way to school. Once she arrived, the school resource officer and school counselor rushed Z.A. to the emergency room.[27]

22. Not long afterwards, Z.A. was admitted to the emergency room once more following a sudden onset of vomiting and tachycardia. Initially this was suspected to be nothing more than a physical illness, but Z.A. later confessed that she had attempted to commit suicide via overdose.[28]

---

[21] *See* R.183, 201, 212.
[22] R.182; *see also* R.179, 201-202.
[23] *See* R.179.
[24] *See* R.179, 202, 216.
[25] R.179.
[26] *See id.*
[27] *See* R.180.
[28] *See id.*

23. Although staff at Z.A.'s middle school tried to help her, Z.A. was defiant and refused to work with them.[29]

24. Z.A. could not "regroup" and would not take responsibility for her actions.[30]

25. She told school staff that she would "speak [her] mind" and that would "never change."[31]

26. The school "tried every intervention [they] had in a comprehensive middle school," including conferences with Z.A.'s parents; Z.A. attending regular sessions with the school counselor; giving Z.A. a "Hot Pass" to the counseling center, administrators' offices, and the "intervention room"; "restorative activities" like writing apology letters and doing community service; class and teacher changes; giving Z.A. a shortened day; establishing a behavior contract; working with an "intervention teacher"; and implementing an individual student success plan.[32]

27. Z.A.'s assistant principal, Tracey Leyde, later said that "Z was **THE** student I was most concerned about…." She recounted that "[i]n my 18 years as an educator I have seen a lot of students needing intensive mental health support and Z ranks right there at the top of the list as one of the most severe." [33]

28. Shortly after they were informed about Z.A.'s suicidal thoughts, Z.A.'s parents sought professional help for her. Z.A. began counseling in seventh grade. [34] In the eighth grade, Z.A. attended weekly sessions with Dr. Pat Sharp, Ph.D., who diagnosed her with persistent depression disorder and generalized anxiety disorder.[35]

---

[29] *See* R.179.
[30] R.183.
[31] R.208.
[32] R.183, *see also* R.203-208, 256.
[33] R.183 (bolding and capitalization in original), *see also* R.256.
[34] *See* R.178.
[35] *See* R.178, 180, 218.

29. Z.A.'s primary care doctor also prescribed her Prozac.[36]

30. Z.A.'s parents attempted to find additional professional help for Z.A., but Z.A. manipulated those practitioners into believing that she did not need help.[37]

31. After a year of weekly counseling with Dr. Sharp, Dr. Sharp transferred Z.A. to Dr. Jeanette Higgins, Psy.D.[38]

32. Dr. Higgins completed neuropsychological testing and similarly diagnosed Z.A. with a depressive disorder, a parent-child relationship problem, social exclusion or rejection, and a provisional diagnosis of a bipolar and related disorder.[39]

33. Because by this time Z.A. had been taking Prozac for a year and it did not appear to be helping, but may have been exacerbating her symptoms, Dr. Higgins recommended that Z.A. wean off it.[40]

34. From January to June 2018, Dr. Higgins became increasingly concerned as Z.A.'s "emotional and behavioral functioning decompensated further."[41]

35. And when Dr. Higgins asked Z.A. about her behavioral incidents at school, Z.A. "smiled, stated she had fun, related that she did not see why her behavior was a problem, and expressed no concern regarding the consequences of her behavior."[42]

36. Z.A. began an intensive outpatient counseling program, but towards the end of Z.A.'s eighth grade school year, Z.A. was fully suspended from school. The Washington State

---

[36] *See* R.180, 218.
[37] *See* R.180-181.
[38] *See* R.180, 218, 9174.
[39] *See id.*
[40] *See* R.180, 181, 218, 252, 558.
[41] R.218.
[42] *See* R.218.

School Ombudsman told Z.A.'s parents that the school district was unable to meet Z.A.'s mental health needs. [43]

37. Dr. Higgins recommended that Z.A. receive residential treatment because she "had significant concerns regarding [Z.A.'s] risk for continued psychiatric decompensation without intensive intervention such as a residential program where she can be continuously monitored and treated."[44]

38. Z.A.'s parents consequently admitted her to BlueFire Wilderness Academy ("BlueFire").[45]

### Z.A.'s Treatment at BlueFire

39. Z.A. was admitted to BlueFire on June 4, 2018.[46]

40. Upon her admission, Z.A. was diagnosed with the DSM-V Axis I disorders of major depressive disorder and generalized anxiety disorder, as well as parent-child relational problems.[47]

41. At BlueFire, Z.A. attended individual therapy twice a week, group therapy three to four times a week, equine therapy once a week, and family therapy (by phone) once a week.[48] Z.A.'s treatment included her keeping a "Mood Journal."[49] And Z.A.'s parents attended "a 3 day intensive family workshop" with her.[50]

---

[43] *See* R.139, 181.
[44] R.218.
[45] *See* R.181.
[46] *See* R.89.
[47] *See* R.139, 140, 182, 254.
[48] *See* R.140-143.
[49] R.141.
[50] *See* R.134.

42. Z.A.'s therapist at BlueFire, Shannon Kerrick, LCSW, noted that Z.A.'s progress was slow because Z.A. struggled to "regulate and express her emotions effectively…."[51]

43. While Z.A. had progressed on coping with her depressive symptoms and using conflict resolution techniques, Z.A.'s treatment team expressed that she "was still struggling with emotional regulation and accepting boundaries, limits and expectations from authority figures" and she "continued to have emotional outbursts until her discharge date."[52]

44. For example, in a telephonic family therapy session with her parents on August 1, 2018, Z.A. yelled at her parents until they hung up, then yelled at her therapist and angrily "rolled on the ground."[53]

45. Z.A. also "continued to test her boundaries during her stay, including walking out of camp and becoming angry and throwing small rocks and being destructive with personal items."[54]

46. Z.A.'s treatment team at BlueFire were consequently concerned about Z.A.'s ability to handle stressors outside of a controlled environment.[55]

47. Because of this, as well as Z.A.'s continued "behavioral issues" and "past life-threatening and impulsive behaviors," Z.A.'s treatment team recommended that Z.A. continue treatment at a residential treatment facility after she discharged from BlueFire.[56] They advised that Z.A. "continue treatment in a residential therapeutic setting with firm boundaries, limits and expectations" and continue individual, group and family therapy to

---

[51] R.182, 254.
[52] R.134.
[53] R.129.
[54] *Id.*
[55] *See* R.182, 254.
[56] *Id.*

learn "further emotional regulation, interpersonal effectiveness and distress tolerance techniques."[57]

48. Z.A. discharged from BlueFire on August 8, 2018.

## Z.A.'s Treatment at Uinta

49. Z.A. admitted to Uinta on August 9, 2018. She was fourteen years old.[58]

50. Z.A. was initially diagnosed with an unspecified depressive disorder, parent-child relational problem, social exclusion or rejection, and a provisional diagnosis of an unspecified bipolar and related disorder.[59] But her treatment team noted that the "testing provided so far is minimal and insufficient" and "[f]urther testing is pending and it is expected that the diagnoses are not currently accurate and will change."[60]

51. Z.A.'s treatment team's initial objectives were to monitor Z.A. for safety; assess her level of depression, mood lability, and executive functioning; test her for accurate diagnoses; provide an academic evaluation; and begin therapy.[61]

52. At admission, Z.A.'s assessed herself as not having any suicide risk factors, but her treatment team noted Z.A.'s prior suicide attempt(s) and her self-harm.[62] They consequently required staff to keep Z.A. at "elevated eye sight" at all times and they also checked on Z.A. every fifteen minutes during the night.[63]

---

[57] R.133-134.
[58] See R.400, 552, 564.
[59] *See* R.400, 552.
[60] *Id.*
[61] *See* R.552.
[62] R.548-549, 560.
[63] R.549; *see also e.g.*, R.564.

53. Z.A. remained at "elevated eye sight" until September 28, 2018 when she stepped down to "eye sight" supervision, but staff continued to check on her every 15 minutes through the night.[64]

54. Uinta's staff continued to check on Z.A. every fifteen minutes at night throughout at least March 28, 2019.[65]

55. After further evaluation and testing, Z.A.'s treatment team diagnosed her with persistent depressive disorder, generalized anxiety disorder, and dependent personality traits.[66]

56. Like at BlueFire, while at Uinta, Z.A. attended group therapy three to four times a week, individual therapy twice per week, family therapy (by phone) once per week, as well as equine therapy twice a week and milieu group therapy once a day.[67] Part of her milieu included DBT therapy.[68]

57. Z.A. was also prescribed Lamictal.[69] Her dosage was increased in late November 2018.[70]

58. For the first four months of treatment at Uinta, Z.A. made progress in her treatment and her treatment team noted that she was sometimes happy and her motivation could be good.[71] But in many ways, she continued to struggle. For example, on:

- August 23, 2018—Z.A. refused to accept a consequence and hit a teacher. When staff members restrained her, she scratched two of them and damaged the bathroom door. Later that night, Z.A. began arguing with a staff member and

---

[64] R.368-369, 372.

[65] *See, e.g.*, R.260, 279, 302, 308, 348, 1329, 1382. The pre-litigation record does not include Z.A.'s daily night shift logs after March 28, 2019.

[66] *See* R.1348; *see also* R.181, 252.

[67] *See* R.321-323, 402, 552, 1345-1347, 350-1352.

[68] *See* R.1402, 1403, 1405.

[69] *See* R.381. Lamictal is the brand name for lamotrigine, "a mood stabilizer medication that works in the brain" and "is approved for the treatment of bipolar disorder." https://www.nami.org/About-Mental-Illness/Treatments/Mental-Health-Medications/Types-of-Medication/Lamotrigine-(Lamictal).

[70] *See* R.277.

[71] *See e.g.*, 455, 457.

shook the staff member. Z.A. then shook and hit another staff member with her fist. After an hour, Z.A. finally calmed down.[72]

- August 23, 2018 to August 26, 2018—Z.A. was on "Suicide Watch."[73]

- August 24, 2018—staff found "mats" in Z.A.'s hair when she was unable to comb it. Z.A. also refused to follow instructions for an hour in the morning and stopped following instructions after lunch.[74]

- September 3, 2018—Z.A. was given a consequence for feces staff found in a trash can.[75]

- September 4, 2018—Z.A. became very upset with the staff and locked them out of the house. When staff members gained entry, Z.A. "became verbally aggressive." For several hours, Z.A. picked things up around the house and "destroy[ed]" them or threw them at staff. She also took a butter knife and threatened staff members with it while stabbing things. When the home manager finally restrained Z.A., she became "more verbally aggressive" and tried to scratch staff members. Z.A. remained in the restraint for about an hour until she calmed down.[76]

- September 5, 2018—Z.A. became "increasingly aggravated" in a phone call with her parents and began "yelling and cussing" at them and her therapist. When staff members took her into the living room, she began kicking them and picked up a glass figure and threw it across the room. Staff restrained Z.A. for an hour until she finally calmed down.[77]

- September 6, 2018—Z.A.'s therapist ended a phone call with Z.A.'s parents early because Z.A. continued to yell at them. And when Z.A. was questioned about "some contraband," she became "frustrated and went out of instructional control."[78]

- September 12, 2018—Z.A. vomited and staff "came to the conclusion that it was most likely psychosomatic."[79]

---

[72] *See* R.497, 500.
[73] R.490, 493-499.
[74] R.491.
[75] *See* R.457.
[76] R.455, 449.
[77] R.450.
[78] R.445-446.
[79] R.425.

- September 13, 2018—Z.A.'s therapist noted that Z.A. "struggles to take accountability and tries to blame others for her behavior."[80]

- September 16, 2018—Z.A. "struggled dealing with her frustration" and "became upset with staff."[81]

- September 23, 2018—When staff told Z.A. to help put dishes away, she "began crying uncontrollably" and told staff she "hated them." She became "verbally aggressive" and started "hitting and kicking pillows." Z.A. then refused to go to bed.[82]

- September 26, 2018—Z.A.'s therapist noted that Z.A.'s "family has a lot of conflict but does not resolve it and becomes resentful."[83]

- October 11, 2018— Z.A. received a flu shot and she "was very dysregulated before and during" and "took some time to calm down afterwards."[84]

- October 31, 2018— Z.A. "struggled taking accountability for behavior" and "became somewhat dysregulated hearing mom's feedback" during a phone call. Z.A. also "struggled to make eye contact and sit still" during her psychopharmacological management session.[85]

- November 27, 2018— Z.A. reported that she was feeling more anxious and frustrated and had been struggling to focus.[86]

59. By December 10, 2018, Z.A. was making "modest" gains[87] and was in the "preparation stage of change."[88] Her treatment team noted that although she was "gaining insight into her depressed mood" and was "working on identifying her emotions and expressing them appropriately," Z.A. continued to experience high anxiety, struggled to show empathy or concern for others due to "having limited insight into her own emotions," was "dependent

---

[80] R.422.
[81] R.409.
[82] R.390.
[83] R.380.
[84] R.342.
[85] R.307-308.
[86] R.277.
[87] R.1341.
[88] R.1342.

on one or two of her friends and rarely interact[ed] positively with any of her other peers," "struggle[d] accepting decisions and feedback from her parents," and was "frequently rude to the teachers" and would often leave the classroom.[89] Z.A.'s treatment team advised that continued treatment at Uinta was necessary because Z.A. was "beginning to do the hard work," but "if she were to leave treatment now, [she would] most likely relapse into worse and dangerous behaviors."[90]

60. By March 2019, Z.A. appeared to have become "stuck" in her progress.[91] Her treatment team noted the following:

- February 9, 2019—Z.A. was displaying "disrespectful attitudes towards teachers in school and bullying towards other girls." She was "struggling to take accountability and [was] not receptive towards feedback from any of the school staff."[92] Z.A. was also "defensive about some despondent behavior."[93]

- March 13, 2019—Z.A.'s therapist ended their session early after Z.A. refused to discuss the therapist's suggestions.[94]

- March 15, 2019— Z.A. "struggled to accept feedback from her parents."[95]

- March 21, 2019— Z.A. "continue[d] to struggle with black and white thinking."[96]

- March 26, 2019—Z.A. reported that "she has been frustrated a lot lately." Z.A. had been arguing with staff, raising her voice, and walking away. She was not using the skills she had learned to calm herself.[97]

- March 27, 2019—Z.A. became "agitated" in therapy.[98]

---

[89] R.1341-1342.
[90] R.1342.
[91] R.1355; *see also* R.1339-1340, 1345-1347.
[92] R.1396.
[93] R.1397.
[94] *See* R.1375.
[95] R.1371.
[96] R.1358.
[97] R.1332.
[98] R.1331.

61. In March, Z.A.'s treatment team continued to advise that Z.A. needed to continue treatment at Uinta so that she does not "relapse into worse and dangerous behaviors."[99]

62. Over time, Z.A. progressed and she discharged successfully from Uinta on August 27, 2019.

**Defendants' Denials of Z.A.'s Claims for Benefits for BlueFire and Plaintiffs' Appeals**

63. In a series of Explanation of Benefits ("EOB") statements United denied payment for Z.A.'s treatment at BlueFire under code B6: "Additional information we requested from the provider was not received within the required timeframe. Charges in the provider responsibility field were denied."[100]

64. On January 10, 2019, Plaintiffs submitted a level one appeal of the denial of Z.A.'s treatment.[101] They explained that after receiving the denial EOBs they contacted United through a representative and United told them the information it required was Z.A.'s medical records and instructed them to submit a copy of her records.[102] Plaintiffs stated that they faxed this information to United on October 3, 2018.[103]

65. Plaintiffs also explained in their appeal that United failed to respond to M.A.'s record submission on October 3, he reached out though a representative on November 16, 2018, to follow up. R.90. The United representative told them the claims were under review and could take 30 days to process but did confirm that the medical records had been received

---

[99] R.1340.
[100] R.89, 93-108.
[101] *See* R.89-171.
[102] *See* R.90.
[103] *See id.*

on October 3, 2018. R.90. M.A. sent United another copy of Z.A.'s medical records for good measure.[104]

66. Plaintiffs included a copy of Z.A.'s medical records, the October 3rd fax transmission sheet, and October 3rd fax confirmation sheet with their appeal.[105]

67. In a letter dated February 14, 2019, United again denied payment for Z.A.'s treatment. The letter gave the following justification for the denial:

> Based on the Optum Behavioral Clinical Policy for Wilderness Therapy, it is my determination that no authorization can be provided for DOS 06/16/2018 through 08/08/2018. Your daughter attended Blue Fire Wilderness Therapy, a Wilderness Therapy program. According to the Optum Behavioral Clinical Policy on Wilderness Therapy, such treatment is considered unproven and not medically necessary. As such, treatment in a Wilderness Therapy program is not a covered benefit. In addition, Blue Fire Wilderness Therapy did not appear to provide the scope or intensity of services that would meet the definition of a clinical residential treatment center. Evidence based treatment known to help your child's condition was available in the community.[106]

68. On April 2, 2019, Plaintiffs submitted a level two appeal of the denial of Z.A.'s treatment at BlueFire, stating that Z.A.'s treatment was clinically appropriate and that there was no exclusion in their insurance policy for the outdoor behavioral health treatment Z.A. received. Plaintiffs included BlueFire's State of Idaho license, which they claimed clearly showed BlueFire's legitimacy as an intermediate level mental healthcare provider.[107] They also asserted that United's exclusion of outdoor behavioral health treatment was a violation of MHPAEA.[108]

---

[104] *See* R.90, 136-138.
[105] *See* R.90, 110-112.
[106] R.1813-1814.
[107] *See* R.1794, 1853, 1855-1871.
[108] *See* R.1797-2774.

69. Plaintiffs further pointed out that BlueFire met the Plan's definition of an alternate facility.[109] Plaintiffs quoted the Plan's definition of experimental and investigational care and contended that BlueFire did not meet those definitions. Plaintiffs stated that the effectiveness of wilderness treatment was backed up by peer reviewed literature and they included the contact information of an expert in the field, Dr. Michael Gass from the University of New Hampshire, encouraging United to contact him with any questions.[110] Plaintiffs further included numerous peer-reviewed academic research articles totaling seven-hundred and twenty-five pages.[111]

70. Plaintiffs further argued that Z.A.'s treatment at BlueFire met the Plan's definition of medically necessary, and they included Z.A.'s medical records, as well as letters of medical necessity from Alison M. LaFollette, Ph.D., a member of Z.A.'s treatment team at BlueFire who conducted a psychological assessment of Z.A., a letter from Dr. Jeanette Higgins, Psy.D., Z.A.'s therapist who recommended she enter residential treatment and performed a psychological evaluation of Z.A., a letter from Shannon Kerrick, LCSW, Z.A.'s therapist at BlueFire, and a letter from Tracey Leyde, Z.A.'s middle school assistant principal.[112]

71. In a letter dated May 3, 2019,[113] United upheld the denial of payment for Z.A.'s treatment. The reviewer wrote:

> The criteria were not met because:

---

[109] *See* R.1790, 1795.
[110] *See* R.1792, 1801-1804.
[111] *See* R.2004-2729.
[112] *See* R.1805, 2766-2773.
[113] United actually sent the Plaintiffs multiple letters dated May 3, 2019. Each letter was signed by Howard Wong, MD and offered the same justification for denying payment. However, each letter addressed different dates of service.

- Your child did not need the care provided in an Outdoor Behavioral Health setting, which is most closely aligned with and billed at the Mental Health Residential Treatment Center level of care.
- Your child did not need the care provided in a Residential Treatment Center program.
- Your child was enrolled in a residential Wilderness Therapy Program, which is not a covered benefit.
- Your child could have been safely treated in a less intensive Level of Care.

In your case:
- Your child was not taking any scheduled medications.
- Your child was able to participate in her treatment plan.
- Your child was not acting on every impulse.
- Your child safely engaged in organized outdoor activities and camping trips.
- Your child was not reported to be dangerous to herself or others.
- Your child was able to look after her day to day needs.
- Your child did not have clinical issues requiring 24/7 monitoring.
- Your child had a safe place to live and the support of family.

The request cannot be approved at this time by your health plan. Instead your child could have continued care in the Mental Health Partial Hospital Program (PHP) setting, with family and community supports. PHP provides continued structure with frequent provider. [sic] Partial Hospitalization lets patients practice coping skills outside of program hours. Children and adolescents usually live at home during PHP. Please talk to your provider about your child's care.[114]

72. United's denial letter did not address any of Plaintiffs' arguments, Z.A.'s treating professionals' opinions, or the literature that Plaintiffs submitted with their appeal.[115]

73. On June 26, 2019, Plaintiffs submitted a second level two member appeal.[116] They explained that despite their requests that United review the complete dates of Z.A.'s treatment, it had arbitrarily chosen to exclude certain dates of service and issue separate

---

[114] R.3780.
[115] *See id.*
[116] *See* R.3769-4776.

denials. This forced them to draft a second level two appeal to address the dates of service that United had not previously considered.[117]

74. In a letter dated July 24, 2019, United upheld the denial of payment for Z.A.'s treatment from June 4, 2018 to June 15, 2018. The reviewer again did not address Plaintiffs' arguments or evidence they included in their appeal. Rather, the reviewer wrote:

> Your child was admitted for treatment of mood problems. After reviewing the medical records, it is noted that your child's condition did not meet Guidelines for coverage of treatment in this setting. Your child was stable from a medical and mental health standpoint, as she was able to participate in activities in the field. She was not taking any medication. She was able to take care of her needs. She had family support. She did not require 24-hour care. In addition, treatment at this facility was not at the level of intensity expected at this level of care.
> The facility is a wilderness therapy program. There is not enough evidence that wilderness therapy is safe and effective for treating mental health conditions. Your child could have continued care in the Mental Health Partial Hospitalization Program setting.[118]

75. Plaintiffs thereafter requested that United's denials be evaluated by an external review agency.[119] The external review agency upheld the denial of payment for Z.A.'s treatment.[120]

**Defendants' Denials of Z.A.'s Claims for Benefits for Uinta and Plaintiffs' Appeals**

76. United also initially denied payment for Z.A.'s treatment at "Unity Academy RTC." The United reviewer wrote:

> It is my opinion that the requested service does not meet the level of care guideline required to be followed in your child's behavioral health plan benefits.
>
> After looking at your child's information it looks like your child was stable. Your child was not having any medical problems. Your child's mood was stable and your child's behavior was stable. Your child was said to be getting along with others, following directions, and there had been no recent dangerous behaviors. It

---

[117] *See* R.3770.
[118] R.9151-9152.
[119] *See* R.4781-6905.
[120] *See* R.9175-9179.

looks like your child could have continued to improve with more treatment in a less intense level of care[.][121]

77. Plaintiffs' submitted a level one appeal, arguing that United relied upon outdated guidelines and Z.A.'s treatment at Uinta was medically necessary. [122] In support, Plaintiffs attached Z.A.'s medical records as well as three letters of medical necessity from Z.A.'s treating professionals. Licensed clinical psychologist Alison LaFollette who treated Z.A. at Uinta wrote:

> Prior to coming to Uinta Academy, [Z.A.]'s family had her in individual therapy and on medication for over a year without success. Due to her escalating anger and suicidality, they enrolled in a wilderness therapy program from June until August 2018.
>
> Given the long-standing nature of [Z.A.]'s problems and the variety of modalities she has engaged in without prolonged success, it is strongly recommended [that] she continue in a residential therapy program which will address her emotional and educational needs. She is currently in need of 24/7 supervision and continual monitoring and feedback. Without 24/7 supervision [Z.A.] will be unable to fully access and benefit from her education.[123]

Shannon Kerrick, LCSW, Z.A.'s therapist at BlueFire wrote:

> [Z.A.] was admitted to our wilderness therapy program on 6/4/18 and discharged on 8/9/18. During this time our clinical team assessed and treated Ms. [Z.A.] for Major Depressive Disorder, Generalized Anxiety Disorder as well as parent-child relational problems. During her stay Ms. [Z.A.] received individual, group, family and equine therapy.
>
> Prior to admittance to Bluefire, Ms. [Z.A.] had multiple self-harm episodes, 2 prior suicide attempts, multiple emergency department visits due to behavioral problems and academic issues. During her stay with us, progress was slow as she struggled to be able to regulate and express her emotions effectively, especially when communicating with her family. Although the client was able to better handle her stressors in a controlled environment the treatment team had concerns with the client being able to manage this if she returned home.

---

[121] R.195.
[122] *See* R.176-644.
[123] R.252.

Due to the slow and limited progress, as well as continued behavioral issues along with the client's past life-threatening and impulsive behaviors it was recommended by the treatment team that the client continue treatment in a residential treatment setting with continued individual, group and family therapy. It is expected that with continued treatment that Ms. [Z.A.] will be able to return home and be able to return to function at a greater capacity.[124]

And Tracey Leyde, Z.A.'s assistant principal wrote:

Z was **THE** student I was most concerned about going to a large High School. We held transition meetings and sent up info to the HS counselor and intervention teacher. Having been an administrator at that high school just 2 years before I was terrified Z (who is a brilliant, funny, creative, interesting, fierce, protective young woman) would get lost – I knew she would just walk out the door each day and end up on the streets of down town [sic] Spokane. In my 18 years as an educator I have seen a lot of students needing intensive mental health support and Z ranks right there at the top of the list as one of the most severe. [125]

78. Plaintiffs also included a letter from Michael Connolly, MD, who stated that individuals suffering from acute level symptoms such as psychosis or posing an active threat to themselves or others, "cannot be cared for in a residential treatment setting without violating well-recognized standards for proper care of substance use disorders and mental health issues."[126]

79. United reviewed Z.A.'s treatment from August 9, 2018 through January 3, 2019. United partially overturned the denial of payment, approving her treatment through September 21, 2018 but denying her treatment from September 22, 2018 to January 3, 2019. In a letter dated February 2, 2019, Dr. Nelson P. Gruber stated that Z.A.'s treatment at "Unity Academy RTC" was not medically necessary because:

After reviewing the available information, it is noted your child had made progress and that her condition no longer met Guidelines for further coverage of treatment in this setting. Your child was cooperative, responsive to staff, and medication adherent. She participated fully in her care. She interacted

---

[124] R.253-254.
[125] R.255-256 (Emphasis in original).
[126] R.186.

appropriately with staff and peers. She was usually open and receptive to feedback and coaching. She presented no significant, acute behavioral management challenges. Your child posed no risk of harm to herself or others. She had no self harm behaviors. She was keeping herself safe. She was not aggressive or destructive. Her thinking made sense. Her mood was stable and positive overall; no serious disturbance was present. She continued to develop and utilize coping skills. There was no report of problems with eating or sleeping. Self care was adequate. There were no concerning medical issues. Medication appeared helpful. You were supportive and involved. She no longer appeared to need the treatment intensity of a 24 hour monitored setting. It appears that care could have continued in a less restrictive setting. Given progress, your child could have continued care in the Mental Health Intensive Outpatient Program or Outpatient setting.[127]

80. In a letter dated February 8, 2019, United also denied payment at "Unity Academy RTC" from January 4, 2019, forward. The reviewer Dr. Michael Soto gave the following justification for the denial:

> After reviewing all of the materials presented (473 pages) for the urgent appeal, there is no documentation to support your daughter's ongoing need for residential treatment. The most recent clinical note was a group note dated 12/13/2018. There was no report of ongoing defiance, self-injurious behaviors or aggression. It appears that your child was fully participating in groups and activities and was learning coping skills. Your daughter is even reported to take her own time-outs when she experienced anger, anxiety, or depressive symptoms without prompting from staff. It appears that your daughter could have continued her recovery at the intensive outpatient level of care.[128]

81. Plaintiffs submitted a level two appeal of the denial of Z.A.'s treatment at Uinta.[129] Along with the prior letters of medical necessity, Plaintiffs included another letter of medical necessity from Melissa Adamson, MSW, LCSW, dated December 15, 2018, who treated Z.A. at Uinta. She said:

> While [Z.A.] has made some clinical progress since admission, she continues to need a highly structured and clinically intensive environment. …

---

[127] R.1145-1146.
[128] R.1151-1152.
[129] *See* R.1118-1784.

> [Z.A.'s] aggression can be contained in our environment but in a traditional school setting, she puts others at risk for physical injury and herself at risk for retaliatory aggression from others and involvement with the state legal system. Without a highly structured and closely monitored daily living environment, [Z.A.] will continue to struggle academically and socially, and escalate into dangerous and potentially life threatening behaviors. …

> Even with this high level of therapeutic support, [Z.A.] struggles to engage academically and has made slow progress. Our treatment team strongly believes that without continued therapeutic support, [Z.A.] will lose the little academic progress she has made and will not be able to reach her full academic potential.

> It is strongly recommended that [Z.A.] continue and complete treatment at Uinta Academy and learn how to have relationships enabling her to function in society, how to keep herself safe, how to be successful in school, and learn to set appropriate boundaries and establish a sense of self.[130]

82. Plaintiffs also included an updated copy of Z.A.'s medical records with the appeal. These records showed Z.A.'s continued to struggle with aggression, bullying, hygiene, instances of property destruction, and threatening behaviors. Z.A. was also restrained on multiple occasions and was placed on suicide watch.

83. In a letter dated May 2, 2019, United again upheld the denial of payment for "Unity Academy." It did not address any of Z.A.'s treating professionals' opinions. Rather, the letter stated:

> Your child was admitted for treatment of problems with her mood and behavior. After reviewing the medical records, it is noted your child had made progress and that your child's condition no longer met Guidelines for further coverage of treatment in this setting. She was doing better. She was stable from a medical and mental health standpoint. She was motivated and participating in treatment. She had family support. She was able to take care of her needs. She had behavior problems that could have been addressed at a lower level of care. She did not require 24-hour care. Your child could have continued care in the Mental Health Outpatient setting.[131]

---

[130] R.1128, 1325-1326.
[131] *See* R.6915.

84. Additionally, in a notice with a processing date of July 23, 2019, United denied payment for "Unity Academy RTC" under code S8

> Your plan provides benefits for services that are determined to be covered health services. The information received does not support measurable progress toward defined goals for these services. Therefore, additional benefit are not available.

85. Plaintiffs requested that the denial of payment for Z.A.'s treatment at Uinta be evaluated by an external review agency.[132] The external review agency upheld the denial of payment for Z.A.'s treatment.[133]

86. Having exhausted their pre-litigation appeal obligations, Plaintiffs initiated this lawsuit.

**Relevant Plan and Internal Criteria Language**

87. The Plan provides benefits for "Covered Health Services," which it defines as:

> those health services, including services, supplies or Pharmaceutical Products, which UnitedHealthcare determines to be:

> - Medically Necessary;

> - included in Sections 5 and 6, *Plan Highlights* and *Additional Coverage Details* described as a Covered Health Service;

> - provided to a Covered Person who meets the Plan's eligibility requirements, as described under *Eligibility* in Section 2, *Introduction*; and

> - not identified in Section 8, *Exclusions.[134]*

88. The Plan defines "Medically Necessary" as

> healthcare services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance use disorder, condition, disease or its symptoms, that are all of the following as determined by UnitedHealthcare or its designee, within UnitedHealthcare's sole discretion. The services must be:

> - In accordance with Generally Accepted Standards of Medical Practice;

---

[132] *See* R.6911-8640.
[133] *See* R.9180-9186.
[134] United-Kaiser_12168.

- clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance use disorder disease or its symptoms;

- not mainly for your convenience or that of your doctor or other health care provider; and

- not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.[135]

89. As relevant here, under Section 8, the Plan excludes "Experimental or Investigational or Unproven Services."[136]

90. The Plan defines "Experimental or Investigational Services" as:

medical, surgical, diagnostic, psychiatric, mental health, substance-related and addictive disorders or other health care services, technologies, supplies, treatments, procedures, drug therapies, medications or devices that, at the time UnitedHealthcare makes a determination regarding coverage in a particular case, are determined to be any of the following:

- not approved by the U.S. Food and Drug Administration (FDA) to be lawfully marketed for the proposed use and not identified in the American Hospital Formulary Service or the United States Pharmacopoeia Dispensing Information as appropriate for the proposed use;

- subject to review and approval by any institutional review board for the proposed use (Devices which are FDA approved under the *Humanitarian Use Device* exemption are not considered to be Experimental or Investigational); or

- the subject of an ongoing Clinical Trial that meets the definition of a Phase 1, 2 or 3 Clinical Trial set forth in the FDA regulations, regardless of whether the trial is actually subject to FDA oversight.

Exceptions:

- Clinical trials for which Benefits are available as described under *Clinical Trials* in Section 6, *Additional Coverage Details*.

---

[135] *See* United-Kaiser_12172-12173.
[136] United-Kaiser_12123-12124.

- If you are not a participant in a qualifying Clinical Trial as described under Section 6, *Additional Coverage Details*, and have a Sickness or condition (one that is likely to cause death within one year of the request for treatment), UnitedHealthcare may, at its discretion, consider an otherwise Experimental or Investigational Service to be a Covered Health Service for that Sickness or condition.[137]

91. The Plan defines "Residential Treatment" as

treatment in a facility which provides a program of effective Mental Health Services or Substance-Related and Addictive Disorders Services treatment. The facility meets all of the following requirements:

- It is established and operated in accordance with applicable state law for Residential Treatment programs;

- it provides a program of treatment under the active participation and direction of a Physician and approved by the Mental

- Health/Substance-Related and Addictive Disorders Administrator;

- it has or maintains a written, specific and detailed treatment program requiring full-time residence and full-time participation by the patient; and

- it provides at least the following basic services in a 24-hour per day, structured milieu:

  - room and board;
  - evaluation and diagnosis;
  - counseling; and
  - referral and orientation to specialized community resources.

A Residential Treatment facility that qualifies as a Hospital is considered a Hospital.[138]

92. The Plan defines "Alternate Facility" as

a health care facility that is not a Hospital and that provides one or more of the following services on an outpatient basis, as permitted by law:

- surgical services;

---

[137] United-Kaiser_12170-12171.
[138] United-Kaiser_12175-12176.

- Emergency Health Services; or

- rehabilitative, laboratory, diagnostic or therapeutic services.

An Alternate Facility may also provide Mental Health or Substance-Related and Addictive Disorders Services on an outpatient basis or inpatient basis (for example a Residential Treatment facility).[139]

93. To evaluate Z.A.'s claim for benefits at BlueFire, United relied on the Optum Behavioral Clinical Policy for "Wilderness Therapy."[140] The policy provides a blanket exclusion: "Wilderness therapy is unproven and not medically necessary for the treatment of emotional, addiction, and/or psychological problems…."[141]

## **STANDARD OF REVIEW**

The standard of review differs somewhat between Plaintiffs' causes of action. For both claims, the Court should grant summary judgment if Plaintiffs show that "there is no genuine dispute as to any material fact" and that Plaintiffs are "entitled to judgment as a matter of law."[142] However, when both parties to a cause of action involving wrongful denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B) move for summary judgment, thereby effectively "stipulat[ing] that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[143]

By contrast, Plaintiffs' second (MHPAEA) cause of action has the contours of a more typical motion for summary judgment with the non-moving party entitled to the usual inferences

---

[139] United-Kaiser_12166.
[140] *See* R.1967-9172.
[141] R.9167.
[142] Fed. R. Civ. P. 56(a).
[143] *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (citation and internal quotation marks omitted).

in its favor. The MHPAEA cause of action requires *de novo* review because it involves the question of whether the Defendants have violated a federal statute.[144]

## ARGUMENT

### I. THE COURT SHOULD IMPOSE THE *DE NOVO* STANDARD OF REVIEW.

The Supreme Court has determined that, in general, "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard" unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[145] If the plan in question does vest discretionary authority, courts instead apply a "deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[146]

However, even if a plan vests discretionary authority in an administrator, a defendant forfeits access to the deferential "arbitrary and capricious" or "abuse of discretion" standard of review if it fails to comply with ERISA's procedural requirements.[147] In 2002, the Department of Labor established procedural regulations (the "2002 regulations") to "set[ ] forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by

---

[144] *See Beckstead v. EG&G Tech. Servs. Emple. Benefit Plan*, 2006 U.S. Dist. LEXIS 86158, at *8 (D. Utah 2006) (citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) for the proposition that "the determination of a Plan Administrator's compliance with ERISA's statutes and regulations is one of statutory interpretation in which the Court owes the Plan Administrator no deference."); *see also Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir. 1993) *Munnelly v. Fordham University Faculty & Administration HMO Ins. Plan*, 216 F.Supp.3d 714, 727 (S.D.N.Y. 2018).

[145] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[146] *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citation and internal quotation marks omitted).

[147] *See, e.g., Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1316-17 (10th Cir. 2009) (reviewing an ERISA claim *de novo* because the defendant insurance company violated the procedural requirements of ERISA).

participants and beneficiaries."[148]

In pertinent part the 2002 regulations require that a plan administrator initially denying a claim for benefits must provide the claimant with information including: (1) "[t]he specific reason or reasons for the adverse determination;" (2) "[r]eference to the specific plan provisions on which the determination is based;" (3) "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" and (4) for denials based on lack of medical necessity, "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."[149]  ERISA's claims procedure regulations also provide that ERISA's guarantee of a "full and fair review" of a plan administrator's denial of benefits requires that the administrator must, at minimum: "take[ ] into account all comments, documents, records, and other information submitted by the claimant related to the claim[;]" and (2) provide "reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits[.]"[150]

In sum, these procedures require that the appeals process must represent "a meaningful dialogue between ERISA plan administrators and their beneficiaries"[151] or else the claim denial is "deemed denied on review without the exercise of discretion by an appropriate fiduciary."[152]

Under the now obsolete pre-2002 version of the ERISA regulations, the Tenth Circuit held that, for purposes of retaining deferential judicial review, some failures to comply with the procedural requirements of ERISA could be overlooked so long as the defendant "substantially

---

[148] 29 C.F.R. § 2560.503-1(a).
[149] *Id*. § 2560.503-1(g)(i),(ii),(iii) and (v).
[150] 29 C.F.R § 2560.503-1(h)(2)(iii)-(iv), *Id*. § 2560.503-1(h)(3)(iii).
[151] *Gilbertson v. Allied Signal*, 328 F.3d 625, 635 (10th Cir. 2003) (citation omitted).
[152] *Id*.

complied" with those requirements.[153] The ACA revisions to the claims procedure regulations override this precedent. But even if the Court is inclined to apply *Gilbertson*, Defendants have not shown that they substantially complied with the claims procedure regulations. As the claims administrator and a fiduciary under the plan, Defendants were required to comply with the regulations. They comprehensively failed to do so for at least two reasons.

First, Defendants made no attempt to engage in a "meaningful dialogue" with Plaintiffs.[154] In their appeals for both BlueFire and Uinta, Defendants did not respond to any of the arguments Plaintiffs made or address the exhaustive documentation Plaintiffs attached to their appeals. For example, Plaintiffs argued that BlueFire was licensed and had met the Plan's definition for residential treatment or an alternate facility,[155] but Defendants did not answer these arguments in their denial letters.[156] Nor did Defendants respond to Plaintiffs' argument that wilderness therapy was not experimental or investigational, or address the exhaustive peer-reviewed academic literature totaling seven-hundred and twenty-five pages that Plaintiffs submitted with their appeal.[157] Defendants also failed to respond to Plaintiffs' arguments that Defendants use of acute care criteria to assess Z.A.'s care violated MHPAEA, or Plaintiffs' extensive documentation that Z.A.'s care was medically necessary at both BlueFire and Uinta.[158]

This failure to respond at all to the Plaintiffs' arguments represents a serious departure from claim procedure regulations that mandate "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim,

---

[153] *Id.* at 634.
[154] *Id.* at 635.
[155] *See* R.1790, 1794-1795, 1853, 1855-1871.
[156] R.3780.
[157] *See* R.1792, 1801-1804, 2004-2729.
[158] R.1145-1146, 1151-1152, 3780, 9151-9152.

without regard to whether such information was submitted or considered in the initial benefit determination."[159] Their denial letters consequently are conclusory and lack "any analysis let alone reasoned analysis."[160]

Likewise, Defendants did not demonstrate that they had taken the opinions of Z.A.'s treating professionals into account. Plaintiffs submitted medical necessity letters by Shannon Kerrick, LCSW, Z.A.'s therapist at BlueFire; Tracey Leyde, Z.A.'s middle school assistant principal who exhausted her school's resources to help Z.A.; Alison LaFollette, a licensed clinical psychologist who tested and treated Z.A. at Uinta; and Melissa Adamson, MSW, LCSW, a therapist who treated Z.A. at Uinta.[161] Indeed, Defendants' denial letters variously state that their "review included an examination of the following information: appeal letter, case notes, and claims processing system,"[162] but they give no indication that Defendants read any of these letters submitted by Plaintiffs, and Defendants emphatically do not explain why (assuming Defendants were aware of their opinions) Defendants disagreed with their opinions.

Per the 2002 regulations, fulfilling each of the requirements was the bare minimum necessary to provide Plaintiffs with a full and fair review of Z.A.'s claims.[163] Defendants were not entitled to arbitrarily choose not to comply with ERISA's procedural requirements. Because Defendants extensively and repeatedly failed to comply with ERISA's minimum procedural requirements, the Court should review Defendants' denials of Z.A.'s claims *de novo*.

## II.     DEFENDANTS WRONGLY DENIED Z.A. BENEFITS FOR HER

---

[159] 29 CFR § 2560.503-1(h)(2)(iv)
[160] *D.K. v. United Behavioral Health*, No. 2:17-CV-01328-DAK, 2021 U.S. Dist. LEXIS 117501, at \*35-38 (D. Utah June 22, 2021) (citing *McMillan v. AT&T Umbrella Ben. Plan No. 1*, 746 F. App'x 697, 706 (10th Cir. 2018), 746 Fed. App'x at 706 (emphasis omitted)
[161] *See* R.252-253, 1325-1326, 1805, 2766-2773.
[162] R.1145; *see also* R.3779 (stating that they "reviewed" Plaintiffs' "letter of appeal, the included documents, and your child's available medical and clinical records").
[163] *See* 29 CFR § 2560.503-1(g)-(h).

## TREATMENT AT BLUEFIRE AND UINTA

Whether the Court elects to apply deferential or *de novo* review or not, Defendants wrongly denied A.Z.'s claims for her treatment at both BlueFire and Uinta. Plaintiffs established in their appeals that Z.A.'s treatment at BlueFire was medically necessary, but Defendants did not prove that a plan exclusion applied to deny her benefits. Likewise for Uinta, Plaintiffs proved that her treatment was medically necessary.

### A. Defendants wrongly denied Z.A. benefits for her treatment at BlueFire.

#### 1. *Defendants failed to prove that a Plan exclusion applied to deny benefits for A.G.'s treatment at BlueFire.*

An insurer who denies coverage based on an exclusion has the burden of proving that the exclusion, when interpreted narrowly, applies to the claim being considered.[164] In addition, "[u]nder universally accepted principles of contract construction, ambiguities in an insurance contract are to be construed against the insurer."[165]

Here, Defendants denied Z.A.'s treatment at BlueFire because, they stated, it was "wilderness therapy," which is "not a covered benefit" under the Plan.[166] Defendants later asserted that wilderness therapy is not a covered benefit because it is "unproven and not medically necessary."[167] The Plan, however, does *not* include the term "wilderness therapy."[168]

---

[164] *See, e.g., LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 814-15 (10th Cir. 2010) (noting in an ERISA case that an insurance claims administrator bears "the burden of establishing" that a particular exclusion applies), *Rasenack v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009) (noting that "the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy" (citation and internal quotation marks omitted)*; see also Frerking v. Blue Cross-Blue Shield,* 760 F. Supp. 877, 881 (D. Kan. 1991).

[165] *See Frerking*, 760 F. Supp. at 880-81; *see also Young v. Fidelity Union Life Ins. Co.*, 597 F.2d 705, 707 (10th Cir. 1979); *Kellogg,* 549 F.3d at 828-829; *Miller v. Monumental Life Ins. Co*., 502 F.3d 1245, 1249, 1252-1253 (10th Cir. 2007).

[166] R.3780.

[167] R.1813-1814; *see also* R.9151-9152 (stating that there "is not enough evidence that wilderness therapy is safe and effective for treating mental health conditions").

[168] *See* Kaiser-United_12054-12198.

"Wilderness therapy" is not listed as an exclusion. Rather, in denying Z.A. benefits, Defendants relied on an internal "Clinical Policy" that categorically excludes "[w]ilderness therapy" as "not medically necessary for the treatment of emotional, addiction, and/or psychological problems."[169] This "Policy," however, does not define wilderness therapy.[170]

Defendants' reliance on an internal "Policy" to exclude Z.A.'s benefits was arbitrary and capricious. Claim administrators may not use guidelines or internal policies to change or alter the scope of a Plan's terms.[171] Yet Defendants here created an exclusion that is directly contrary to the Plan's definition of medical necessity. Indeed, Defendants' own Level of Care Guidelines for Mental Health Conditions specifically instructs that

> When deciding coverage, the member's specific benefits must be referenced. All reviewers must first identify member eligibility, the member-specific benefit plan coverage, and any federal or state regulatory requirements that supersede the member's benefits prior to using this guideline. In the event that the requested service or procedure is limited or excluded from the benefit, is defined differently or there is otherwise a conflict between this guideline and the member's specific benefit, ***the member's specific benefit supersedes this guideline***.[172]

And although Defendants did not state that BlueFire is excluded because it falls under the the Plan's definition of an experimental, investigational, or unproven service, as Plaintiffs showed in their appeals, BlueFire does not fit that definition.[173] Instead, as Plaintiffs explained, BlueFire met the Plan's definitions for a residential treatment center or alternate facility.[174] This Court should consequently rule that Defendants wrongly denied Z.A.'s benefits for her treatment at BlueFire.

---

[169] R.9167.
[170] *See id*.
[171] *See McGraw v. Prudential*, 137 F.3d 1253 (10th Cir. 1998).
[172] R.16 (emphasis added).
[173] United-Kaiser_12170-12171.
[174] United-Kaiser_12166, 12175-12176.

In addition, there is no evidence in the Record that supports Defendants' conclusion that BlueFire provided "Wilderness Therapy." Defendants completely failed to define the term or to provide the analysis on which it reached its conclusion. The denial letters did not provide any specific or meaningful information to Plaintiffs to understand how or why Defendants came to that conclusion. Nevertheless, Plaintiffs pointed out that BlueFire was a licensed intermediate outdoor youth treatment program.[175] Without additional explanation from Defendants, the average plan participant or beneficiary had no reason to think that BlueFire was excluded under the Plan. Consequently, Defendants' "wilderness therapy" exclusion should not apply.

Other courts in this District have previously found in this context that a similar term "wilderness camp," without further definition or explanation, is ambiguous.[176] Simply put, there is no evidence either in Defendant's denial letters or in the Record as a whole, justifying the Defendants' determination that BlueFire provided "wilderness therapy" that fit within any exclusionary provision of the Plan. Without a meaningful understanding of Defendant's reasoning, Plaintiffs were in the unenviable position of having no idea of the analysis Defendants applied to deny coverage. This breached Defendants' fiduciary duties to Plaintiffs,[177] and underscores that Defendants abused their discretion in denying Z.A.'s claims.

---

[175] *See* R.1794, 1853, 1855-1871.

[176] *See Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1172-73 (D.Utah 2019) (holding that it was arbitrary and capricious for a defendant insurance company to exclude coverage based on its conclusion that a particular treatment facility was a "wilderness camp" when that term was not defined in the relevant insurance plan).

[177] *See Cirulis v. UNUM Corp. Severance Plan*, 321 F.3d 1010, 1014 (10th Cir. 2003) (noting that a failure to provide notice of exclusions in an ERISA plan to the beneficiaries "contravenes ERISA's mandate that employee-welfare plans be written so as to provide employees with notice of their rights and obligations under the plan"); *see also Member Servs. Life Ins. Co. v. American Nat'l Bank & Trust Co.*, 130 F.3d 950, 956 (10th Cir. 1997) (noting that "a beneficiary [cannot] be bound to terms of the policy of which he had no notice" because "[o]ne of ERISA's central goals is to enable plan beneficiaries to learn their rights and obligations at any time" (citations and internal quotation marks omitted)).

Despite Defendants' shortcomings, Plaintiffs did their best to show that Z.A.'s treatment at BlueFire was not excluded as experimental and investigational. The Record includes Plaintiffs' arguments that outdoor therapy provided by licensed facilities like BlueFire have a long history of success and have been found to be effective programs to treat mental health issues.[178] They presented Defendants with exhaustive peer-reviewed evidence proving that the intermediate outdoor behavioral health treatment that A.G. received at BlueFire was not subject to an experimental or investigational exclusion.[179] The balance of evidence in the Record strongly indicates that wilderness therapy is effective and Defendants were wrong when they denied Z.A.'s claims as not covered under the Plan.

## 2. *Z.A.'s treatment at BlueFire was medically necessary.*

Defendants also wrongly denied payment for Z.A.'s treatment at BlueFire because her care there was medically necessary. The Plan defines "Medically Necessary" as

> healthcare services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance use disorder, condition, disease or its symptoms, that are all of the following as determined by UnitedHealthcare or its designee, within UnitedHealthcare's sole discretion. The services must be:
>
> - In accordance with Generally Accepted Standards of Medical Practice;
>
> - clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance use disorder disease or its symptoms;
>
> - not mainly for your convenience or that of your doctor or other health care provider; and
>
> - not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury,

---

[178] *See* R.2004-2729.

[179] *See id.*

disease or symptoms.[180]

Z.A.'s treatment at BlueFire met this definition. Indeed, Defendants approved forty-four days of Z.A.'s treatment at Uinta *immediately* following her discharge from BlueFire.[181] It does not follow that Z.A.'s treatment could become medically necessary one day *after* her treatment at BlueFire if Z.A. did not also need treatment the day before. And the treatment that Z.A. received at Uinta in those forty-four days are almost identical to those she received at BlueFire.[182]

As Z.A.'s therapist at BlueFire explained, Z.A.'s care was medically necessary because

> Prior to admittance to Bluefire, Ms. [Z.A.] had multiple self-harm episodes, 2 prior suicide attempts, multiple emergency department visits due to behavioral problems and academic issues. During her stay with us, progress was slow as she struggled to be able to regulate and express her emotions effectively, especially when communicating with her family. Although the client was able to better handle her stressors in a controlled environment the treatment team had concerns with the client being able to manage this if she returned home.[183]

And as Z.A.'s former assistant principal, Tracey Leyde, explained, "Z was **THE** student I was most concerned about" and "[i]n my 18 years as an educator I have seen a lot of students needing intensive mental health support and Z ranks right there at the top of the list as one of the most severe." [184] Z.A.'s treatment at BlueFire was medically necessary and Defendants were wrong to deny it.

**B.      Defendants wrongly denied Z.A. benefits for her treatment at Uinta.**

Defendants also wrongly denied Z.A. benefits for her treatment at Uinta after September 21, 2018. Defendants wrote that Z.A.'s care was no longer medically necessary after September

---

[180] *See* United-Kaiser_12172-12173.
[181] *See* R.1145-1146.
[182] *Compare* R.140-143 *with* R.321-323.
[183] R.253.
[184] R.183 (bolding and capitalization in original), *see also* R.256.

21, 2018 because Z.A.

> was doing better. She was stable from a medical and mental health standpoint. She was motivated and participating in treatment. She had family support. She was able to take care of her needs. She had behavior problems that could have been addressed at a lower level of care. She did not require 24-hour care. Your child could have continued care in the Mental Health Outpatient setting.[185]

Defendants are wrong. On September 21, 2022, Z.A.'s diagnoses were still provisional and she was still undergoing testing—her diagnoses were not finalized until November 2018.[186] Z.A. also was not yet stabilized on her medication—it was adjusted in November 2018[187]; and staff was still supervising Z.A. on "elevated eye sight" due to her risk for self-harm and suicide ideation[188]. Yet Defendants ignored these facts as well as a great deal of other evidence in Z.A.'s medical records demonstrating that she was still struggling with the behaviors for which she was admitted:

- August 23, 2018—Z.A. refused to accept a consequence and hit a teacher. When staff members restrained her, she scratched two of them and damaged the bathroom door. Later that night, Z.A. began arguing with a staff member and shook the staff member. Z.A. then shook and hit another staff member with her fist. After an hour, Z.A. finally calmed down.[189]

- August 23, 2018 to August 26, 2018—Z.A. was on "Suicide Watch."[190]

- August 24, 2018—staff found "mats" in Z.A.'s hair when she was unable to comb it. Z.A. also refused to follow instructions for an hour in the morning and stopped following instructions after lunch.[191]

- September 3, 2018—Z.A. was given a consequence for feces staff found in a trash can.[192]

---

[185] See R.6915.
[186] See R.1348.
[187] See R.277, 381.
[188] See R.368-369, 372.
[189] See R.497, 500.
[190] R.490, 493-499.
[191] R.491.
[192] See R.457.

- September 4, 2018—Z.A. became very upset with the staff and locked them out of the house. When staff members gained entry, Z.A. "became verbally aggressive." For several hours, Z.A. picked things up around the house and "destroy[ed]" them or threw them at staff. She also took a butter knife and threatened staff members with it while stabbing things. When the home manager finally restrained Z.A., she became "more verbally aggressive" and tried to scratch staff members. Z.A. remained in the restraint for about an hour until she calmed down.[193]

- September 5, 2018—Z.A. became "increasingly aggravated" in a phone call with her parents and began "yelling and cussing" at them and her therapist. When staff members took her into the living room, she began kicking them and picked up a glass figure and threw it across the room. Staff restrained her for an hour until she finally calmed down.[194]

- September 6, 2018—Z.A.'s therapist ended a phone call with Z.A.'s parents early because Z.A. continued to yell at them. And when Z.A. was questioned about "some contraband," she became "frustrated and went out of instructional control."[195]

- September 12, 2018—Z.A. vomited and staff "came to the conclusion that it was most likely psychosomatic."[196]

- September 13, 2018—Z.A.'s therapist noted that Z.A. "struggles to take accountability and tries to blame others for her behavior."[197]

- September 16, 2018—Z.A. "struggled dealing with her frustration" and "became upset with staff."[198]

- September 23, 2018—When staff told Z.A. to help put dishes away, she "began crying uncontrollably" and told staff she "hated them." She became "verbally aggressive" and started "hitting and kicking pillows." Z.A. then refused to go to bed.[199]

- September 26, 2018—Z.A.'s therapist noted that Z.A.'s "family has a lot of conflict but does not resolve it and becomes resentful."[200]

---

[193] R.455, 449.
[194] R.450.
[195] R.445-446.
[196] R.425.
[197] R.422.
[198] R.409.
[199] R.390.
[200] R.380.

And by March, Z.A.'s treatment stagnated and her treatment advised that Z.A. needed to continue treatment at Uinta so that she does not "relapse into worse and dangerous behaviors."[201]

In addition, Z.A. was diagnosed with persistent depressive disorder.[202] It follows that her treatment needs also be "persistent," and that with the 24-hour treatment and supervision she was receiving at Uinta, her behavior would not be as extreme as before. As one court has explained, the "observation that 'E.W. was not displaying the overt problems for which she was admitted' does not constitute substantial evidence that treatment at La Europa was not medically necessary because, as set forth above, it does not address the confounding variable that residency at La Europa may have been a necessary predicate to E.W.'s improved behavior."[203]

As Defendant's own Common Criteria for Continuing Stay Criteria provide, the factors leading to an adolescent's admission must be considered to provide the appropriate treatment and level of care, taking into account the unique needs the adolescents, including "the pace at which they respond to treatment."[204]

As the Court can observe, the record contains ample evidence demonstrating that it was medically necessary for Z.A. to continue to receive care at a residential treatment center. Accordingly, the Court should either find that that it was medically necessary for Z.A. to be treated at Uinta. But even under the arbitrary and capricious standard, Defendants' denial of Z.A.'s claims for treatment at Uinta fail that review.

As the Tenth Circuit has emphasized, the abuse of discretion standard of review is "not

---

[201] R.1340.
[202] *See* R.1348.
[203] *Wiwel v. IBM Med. & Dental Ben. Plans for Regular Full-Time & Part-Time Employees*, 2017 U.S. Dist. LEXIS 46377, *14, 2017 WL 1184066.
[204] R.16-17.

without meaning."[205] Claims administrators are not permitted to "shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no more evidence in the record to refute that theory."[206] Defendants did precisely that here.

The Tenth Circuit has also found that where a claim administrator's decision is not supported by substantial evidence "based upon the record as a whole," with the court taking into account "whatever in the record fairly detracts from its weight," the court should determine that the administrator's decision was arbitrary and capricious.[207] The Court's abuse of discretion review here should account for the fact that the claim administrator, acting as a fiduciary "must discharge its duties with respect to discretionary claims decisions solely in the interests of the participants and beneficiaries of the plan . . . and consistent with this standard of care must provide a full and fair review of claim denials."[208]

Sister courts in the District of Utah have also ruled that "an ERISA plan fiduciary's failure to utilize the proper plan language or criteria in evaluating whether a plan beneficiary is entitled to benefits is an abuse of discretion."[209] Further, another sister court has also ruled that when a claim administrator's denial letters "contain neither citations to the medical record nor references to the reports by [a defendant's] doctors" concerning a claimant's condition but are

---

[205] *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018).
[206] *Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807 (10th Cir. 2004).
[207] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and internal quotation marks omitted).
[208] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1266 (D.Utah 2020) (brackets, citations, and internal quotation marks omitted) (holding that a similarly situated claim administrator acted arbitrarily and capriciously in denying benefits for mental health and substance use disorders).
[209] *James F. ex rel. C.F. v. Cigna Behavioral Health, Inc*., 2010 U.S. Dist. LEXIS 136134 *17 (D. Utah 2010) (Kimball, J.).

instead composed of "conclusory statements without factual support," the denial is arbitrary and capricious.[210]

Here, Defendants ignored evidence in the record that detracted from their decision to deny Z.A.'s claims, in violation of their fiduciary duties, and relied solely on conclusory statements without factual support. Accordingly, if the Court does not apply *de novo* review, the Court should still find that Defendants' denials were arbitrary and capricious.

## III.    DEFENDANTS VIOLATED MHPAEA.

To establish that Defendants violated MHPAEA, Plaintiffs must demonstrate that: (1) the Plan "is subject to [MHPAEA]"; (2) the Plan "provides benefits for both mental health/substance abuse and medical/surgical treatments"; (3) Defendants placed "differing limitations on benefits for mental health care" as compared to analogous "medical/surgical care"; and (4) the limitations on mental health care are more restrictive than the predominant limitations based on the medical/surgical analogues.[211] Plaintiffs contend that the first and second element of this test are not in dispute.

In analyzing MHPAEA, courts have recognized that three types of inpatient facilities are medical/surgical analogues to the residential mental health treatment that G.K. received in this case: skilled nursing facilities,[212] inpatient rehabilitation facilities,[213] and inpatient hospice

---

[210] *Raymond M.*, 463 F. Supp. 3d at 1282.

[211] *See, e.g., D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 8888 at *9 (D. Utah January 17, 2020) (citations and internal quotation marks omitted).

[212] *See Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1159 (9th Cir. 2018) (noting that under the Final Rules promulgated by the Department of Labor to elaborate on MHPAEA, "skilled nursing facilities" as well as inpatient "rehabilitation hospitals" are analogous to "residential treatment facilities for mental health or substance user disorders.")

[213] *See id*. (noting that under the Final Rules promulgated by the Department of Labor to elaborate on MHPAEA, inpatient "rehabilitation hospitals" as well as "skilled nursing facilities" are analogous to "residential treatment facilities for mental health or substance user disorders.")

facilities.[214]

As the record demonstrates, Defendants apply internal criteria in addition to the terms of the Plan itself to determine whether treatment received at skilled nursing and subacute treatment is medically necessary. Defendants also apply internal criteria beyond the terms of the Plan to determine whether residential mental health treatment is medically necessary. So all Plaintiffs need to prove that Defendants violate MHPAEA is to demonstrate that Defendants place limitations on the mental health disorder treatment Z.A. received that are more stringent than the limitations they place on analogous medical/surgical treatment.

Treatment limitations can be either quantitative or nonquantitative.[215] Nonquantitative treatment limitations include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness."[216] Courts in the District of Utah have further held that MHPAEA violations can be found either on the face of plan documents or they can occur in the manner in which otherwise neutral plan terms are applied in a disparate fashion.[217] In this case, Defendants committed "as applied" MHPAEA violations. First, they utilized a wilderness therapy exclusion that applies only to mental and behavioral health. Second, they utilized acute criteria to determine the medical necessity of sub-acute mental health care resulting in a disparate operation of the Plan. This had the effect of limiting the availability of

---

[214] *See D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 130545 at *7-8 (D. Utah 2020) (finding that because "the appropriate comparison for identifying analogous levels of care between mental health/substance use disorders and medical/surgical treatment is not the type of care, but rather whether the care involved inpatient versus outpatient benefits" and "any care falling in the intermediate range between inpatient and outpatient should be compared regardless of the type of care," inpatient hospice care was analogous to care received at a residential treatment center).
[215] 29 C.F.R. § 2590.712(a).
[216] 29 C.F.R. § 2590.712 (c)(4)(ii)(F), See also *Christine S. v. Blue Cross Blue Shield of N.M.*, , 2021 U.S. Dist. LEXIS 199330, at *23-24
[217] *Id* at *32-34.

benefits for mental health treatment the Plan purports to provide in a more restrictive way than the Plan provides benefits for skilled nursing, inpatient rehabilitation, and inpatient hospice care.

### A. Defendants Violated MHPAEA When They Denied Coverage on the Basis that Wilderness Therapy Is Not Medically Necessary For Mental Health Treatment.

For the purposes of MHPAEA, courts have recognized that inpatient hospice facilities are medical/surgical analogues to the residential mental health treatment that Z.A. received in this case.[218] As the record demonstrates, Defendants apply additional criteria beyond the terms of the Plan – a "Clinical Policy" – to claims for mental health treatment at an outdoor therapeutic program.[219] This "Clinical Policy" categorically excludes "[w]ilderness therapy" as "not medically necessary" but only "for the treatment of *emotional, addiction, and/or psychological problems*."[220] The policy consequently applies only to exclude outdoor mental health treatment, but it does not exclude outdoor medical or surgical treatment. Accordingly, Defendants apply treatment limitations to outdoor therapeutic treatment that are more stringent than the limitations they apply to an analogous level of medical/surgical care. This violates MHPAEA.

### B. Defendants Violated MHPAEA When They Denied Coverage on the Basis that Z.A. Did Not Present with Acute Symptoms.

Residential treatment centers are properly compared to skilled nursing, inpatient rehabilitation and inpatient hospice facilities for purposes of evaluating a MHPAEA violation.[221] A sister court in the District of Utah has also found that a neutral plan term like medical

---

[218] *See D.K. v. United Behavioral Health*, 2020 U.S. Dist. LEXIS 130545 at *7-8 (D. Utah 2020) (finding that inpatient hospice care was analogous to care received at a residential treatment center); *see also M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1031 ("Confining itself to the arguments presented by Defendants, the court disagrees with Defendants that on the specific record before it the only analogous medical/surgical benefits for residential treatment centers are skilled nursing and inpatient rehabilitation facilities.")
[219] R.9167.
[220] *Id*. (emphasis added).
[221] *Johnathan Z.* at *57.

necessity can lead to a MHPAEA violation if the administrator does not apply the term in parity between mental health and substance use coverage decisions and its medical/surgical analogue coverage decisions.[222]

In this case, we know the different reasons that Defendants used to deny benefits for Z.A., because they stated them in their denial letters. Defendants denied Z.A.'s claims for benefits in part because Z.A. "was not reported to be dangerous to herself or others."[223]

In order for those denial rationales to pass a parity analysis, Defendants would have to if a patient presented with an absence of acute symptoms in analogous medical/surgical settings. deny benefits. The Guidelines produced by Defendants do not provide any evidence that Defendants do so.

Even worse, Defendants only cover claims for residential mental health treatment if the patient in question has suffered "acute changes" in the member's signs and symptoms.[224] A sister court in the District of Utah has already held that an insurance claims administrator violates MHPAEA if it attempts to impose the presence of acute symptoms as a requirement for coverage for residential treatment when it specifically excludes the same when evaluating analogous medical/surgical treatment.[225] In this case, the comparison shows that for subacute medical/surgical claims Defendants require the absence of acute changes in a patient's condition and the absence of acute symptoms to obtain coverage for subacute care, but they then used the

---

[222] *Michael D. v. Anthem Health Plans of Ky., Inc*., 369 F. Supp. 3d 1159, 1174-76 (D. Utah 2019).
[223] R. 3780.
[224] Rec. 0147.
[225] *See Jonathan Z. v. Oxford Health Plans*, 2022 U.S. Dist. LEXIS 121033, *59-63 (D. Utah July 7, 2022) (finding that a claims administrator "improperly required [a patient] to exhibit acute symptoms to qualify for RTC care" while not requiring "similarly acute symptoms for comparable medical-surgical treatment").

absence of acute changes and symptoms for Z.A.'s mental health and substance use disorder treatment to deny coverage. The disparity is a MHPAEA violation for which Plaintiffs are entitled to equitable relief.[226]

### IV. THE COURT SHOULD REVERSE DEFENDANTS' DENIALS OF Z.A.'s CLAIMS.

Because Plaintiffs have demonstrated that the care Z.A. received at BlueFire and Uinta was medically necessary, the Court should reverse Defendants' denials of Z.A.'s claims and award summary judgment to Plaintiffs.

The Tenth Circuit has noted that when a claims administrator "had its chance to exercise its discretion and [ ] failed to do so in accordance with the clear guidelines of the Plan and ERISA[,]" remand back to the claims administrator is not an appropriate remedy and plaintiffs are entitled to a district court's judgment on the merits of their claims.[227]

Once they received Plaintiffs' appeals, Defendants had every opportunity to exercise their discretion in compliance with both ERISA and the terms of the Plan by conducting a proper review of Z.A.'s claims. Instead, they relied on cursory and conclusory information that does not engage with the whole of Z.A.'s medical records or the opinions of her treating professionals. If the Court follows *Rasenack*, this militates against remanding the claim back to Defendants.

Furthermore, while ERISA treats more scrupulous claims administrators as somewhat analogous to administrative agencies during a claimant's prelitigation appeals, the text of ERISA itself "does not contain any provisions governing remands to plan administrators once those

---

[226] *M. S. v. Premera Blue Cross,* No. 2:19-cv-00199-RJS-CMR, 2021 U.S. Dist. LEXIS 151055, at *53-54 (D. Utah Aug. 10, 2021).

[227] *See Rasenack*, 585 F.3d at 1327 (10th Cir. 2009) (*citing with approval to Vanderklok v. Provident Life & Accidental Ins. Co.*, 956 F.2d 610, 617 (6th Cir. 1992) (holding that a claims administrator that fails to provide timely notice of its denial of benefits is "not entitled to the protections concerning administrative review")).

actions have been initiated, nor does it explain how judicial review of determinations made on remand is to occur."[228] This runs a significant and problematic risk of creating an unfair "heads we win; tails, let's play again" system should the Court remand under these circumstances.[229]

Further, as a pragmatic matter, the treatment at issue in this case began more than four years ago.[230] Remanding the case when it is so clear that Z.A.'s treatment was medically necessary as of June 4, 2018 forces Plaintiffs to re-appeal Defendants' denials using outdated information which, in many cases, is no longer extant. It also imposes an unreasonable delay on an already slow process for which Plaintiffs have so far borne essentially all of the cost and burden. The interests of justice will be best served if the Court reverses, rather than remands, Defendants' denials.

However, if the Court does remand Z.A.'s claims for reconsideration by Defendants, it should limit Defendants' possible bases for denying Z.A.'s claims to the ones it has already articulated in its denial letters. To do otherwise would violates Tenth Circuit precedent, which provides that, in the ERISA context, "remand is not appropriate to provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record."[231] In reaching this conclusion, the Tenth Circuit cited to *Spradley v. Owens-Illinois Hourly Emples. Welfare Benefit Plan* in which they noted that, under ERISA, plan administrators are not permitted "to sandbag" plaintiffs with "after-the-fact interpretation[s]" for denying insurance benefits and that courts should not even consider "post hoc interpretation[s]" of

[228] *Mead v. Reliastar Life Ins. Co.*, 768 F.3d 102, 112 (2nd Cir. 2014).
[229] *Tam v. First Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020) (citation and internal quotation marks omitted).
[230] R.89.
[231] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021).

insurance plan provisions, much less encourage claims administrators to come up with new ones on remand.[232]

### V. THE PLAINTIFFS ARE ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES AND COSTS, AND TO ADDITIONAL BRIEFING ON EQUITABLE REMEDIES.

In the event that the Court grants Plaintiffs' Motion for Summary Judgment, Plaintiffs request the opportunity to present in a future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate based on 29 U.S.C. § 1132(g). Further, in the event that the Court finds that Defendants violated MHPAEA, Plaintiffs request the opportunity to submit further briefing identifying which equitable remedies might be most appropriately tailored to whatever MHPAEA violation the Court articulates.

DATED this 31st day of October, 2022.

*/s/ Brian S. King*
Brian S. King


### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent to all parties registered to receive court notices via the Court's CM/ECF system.

DATED this 31st day of October, 2022.

/s/ Brian S. King
Attorney for Plaintiffs

---

[232] 686 F.3d 1135, 1141 (10th Cir. 2012) (citation and internal quotation marks omitted).